STANLEY JOHNSON, Plaintiff-Appellee, v. COMMONWEALTH EDISON CO., Defendant-Appellant, (A & H Engineering Corp. *et al.*, Defendants).

First District (2nd Division)   No. 84—0612

Opinion filed April 2, 1985.—Rehearing denied May 14, 1985.

474

Francis D. Morrissey, Thomas F. Tobin, and Mark L. Karasik, all of Baker & McKenzie, of Chicago, for appellant.

Nat P. Ozmon, Mark Novak, and Dario A. Garibaldi, all of Anesi, Ozmon, Lewin & Associates, Ltd., of Chicago, for appellee.

JUSTICE BILANDIC delivered the opinion of the court:

In this personal injury action predicated on an alleged violation of the Illinois Structural Work Act (Ill. Rev. Stat. 1975, ch. 48, par. 60 *et seq.*), defendant, Commonwealth Edison Co. (Edison), contests the propriety of a jury verdict and the judgment entered thereon assessing damages against it and in favor of plaintiff, Stanley Johnson, in the amount of $400,000.

On November 18, 1976, while working in his capacity as a laborer for the Walsh Construction Co. (Walsh), plaintiff sustained injuries when he fell during the removal of shoring towers[1] located at Turbine Unit No. 2 of the La Salle County Nuclear Power Plant. Walsh was the prime structural contractor responsible for building the concrete substructure and superstructure of this plant. Edison was the owner of the two-unit power plant, which approved the overall job schedule and saw to it that the several retained contractors, including Walsh,

---

[1]Essentially, "[s]horing is more like super heavy duty scaffolding that is constructed to hold the forms to hold the concrete. It is heavy steel probably two inches in diameter, various sizes." Bearing some degree of semblance to a ladder, the shoring sections in question were 2 feet wide by 6 feet high, connected by cross-braces and, together, constituted a tower which started at the basement level and reached a height of 90-100 feet.

adhered to its directives with respect to such scheduling. Further, the issuance of a permit to Edison from the Federal government was necessary prior to construction of the La Salle power plant; it was Edison's responsibility, therefore, to make sure that all of the plans and specifications were "rigidly adhered to." Edison also had the authority, by virtue of its contract with Walsh, to stop work not being performed in a safe manner.

It was plaintiff's assigned responsibility on November 18, 1976, to assist in the removal of shoring towers located at Turbine Unit No. 2 of the La Salle power plant. Turbine Unit No. 2 held three bays of shoring with approximately 28 towers on each side of each bay. All of the shoring in Turbine Unit No. 1 was previously removed "the normal way," *i.e.*, starting at the top, each section was dismantled from the tower and lowered to the ground individually. Although the same type of shoring was used in Turbine Unit No. 2, a different method of removal was employed when the dismantling of this shoring started in September 1976. A very large crane lowered a line down through the top opening of the turbine unit. After this line was hooked onto the top of a particular shoring tower, the crane pulled the entire tower out through the roof of Turbine Unit No. 2.

On November 18, 1976, it was plaintiff who was responsible for the attachment of the crane line to the top of the shoring towers contained in Turbine Unit No. 2. All of plaintiff's work assignments, including this specific task, were given to him by his foreman, a Walsh employee. The actual decision to employ the modified removal procedure was explained to those involved by Sam Wolinsky and Warren Valley, Edison engineers, and Edward Long, a Walsh superintendent. In essence, "Mr. Wolinsky said that it would be very much quicker to remove the shoring this way." The particular procedure which plaintiff used to connect the crane line involved first hooking a "choker" cable to each tower, and then hooking this cable onto "spreader" cables which were attached to the "large headache ball" of the crane line. The nature of this procedure necessitated that plaintiff stand on a tower in order to connect the crane line.

The accident in question occurred between 9:30 and 10:30 p.m. on November 18, 1976. Plaintiff had just finished attaching the crane line to the top of one of the remaining shoring towers in Turbine Unit No. 2. The condition of this particular tower was "very unstable" and "covered with oil." Plaintiff proceeded to climb down "[t]hree, maybe four" towers over to get some wire in order that he could better secure the back row of towers which were also unstable. At some point soon after he began to descend, the towers, which were intercon-

nected by wood braces, swayed out toward the center of the turbine room and then back toward the wall of the turbine pedestal. Plaintiff thereupon lost his grip, "pushed off as far as [he] could," and fell approximately 40 feet to the ground level. Several of the towers then "crumble[d] like crackers" and fell down into the basement approximately 90 feet below. Plaintiff lost consciousness and his next recollection was waking up in the Community Hospital at Ottawa two days later.

By virtue of his amended complaint at law filed on November 20, 1978, plaintiff sought damages from Edison for an alleged violation of the Illinois Structural Work Act (Act). At trial, Charles Schultz, a construction safety consultant, was permitted to testify as an expert witness that, in his opinion, the method employed to remove the shoring towers from Turbine Unit No. 2 was "a very unsafe practice." The basis for this opinion was two depositions, accident reports, and Schultz' review of other "documents such as the Shoring Institute Standards, the Federal Register and the National Safety Council."

Without presenting a case in chief, defendant rested; thereafter, the trial court granted plaintiff's motion for a directed verdict on the question of whether Edison was in charge of the La Salle power plant construction project. After the issues regarding defendant's purported violation of the Act, causation and damages were submitted to the jury, a verdict was returned in favor of plaintiff. Damages were assessed against defendant in the amount of $400,000. It is the propriety of this verdict and the judgment entered thereon that defendant now contests on appeal.

## I

The initial question for resolution is whether the trial court correctly directed a finding in plaintiff's favor on the issue of defendant, "having charge of" the La Salle power plant construction project.

■ Civil liability under the Act attaches to those parties "having charge of" the work. (Ill. Rev. Stat. 1975, ch. 48, par. 69.) This statutory language is not confined to the exercise of supervision and control over the work. (*Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 321-22, 211 N.E.2d 247.) Rather, it is a generic term, one which Illinois "courts have broadly construed *** to effectively include two classes of potential defendants: (1) those having the right to supervise or control the actual work from which the injury arises; and (2) those with overall responsibility for the work being performed on the job site." *MFA Mutual Insurance Co. v. Crowther, Inc.* (1983), 120 Ill. App. 3d 387, 391, 458 N.E.2d 71, citing *Norton v. Wilbur*

*Waggoner Equipment Rental & Excavating Co.* (1979), 76 Ill. 2d 481, 488-89, 394 N.E.2d 403.

■ Edison cites *McGovern v. Standish* (1976), 65 Ill. 2d 54, 357 N.E.2d 1134, for the proposition that it cannot be held liable under the Act unless it was "in charge of" the particular activity resulting in plaintiff's injuries. However, in *Emberton v. State Farm Mutual Automobile Insurance Co.* (1978), 71 Ill. 2d 111, 373 N.E.2d 1348, our supreme court reviewed the history of the Act and broadly interpreted the phrase "having charge of" so as to all but overrule *McGovern.*[2] Noting the Act's beneficient purpose of preventing injuries to persons employed in the extrahazardous occupation of structural work, the *Emberton* court indicated that liability under the Act is not confined merely to those who perform, supervise, or control the actual work which causes the injury, but also extends " 'to owners and others who have charge of the erection or alteration of any building or structure.' " (71 Ill. 2d 111, 117, quoting *Larson v. Commonwealth Edison Co.* (1965), 33 Ill. 2d 316, 321-22.) As a result, it is not necessary that a party be in direct charge of the particular operation from which the injury arose if it is in charge of the overall work for the project under construction. (*Crist v. Debron Corp.* (1981), 96 Ill. App. 3d 668, 672, 421 N.E.2d 997.) One or more parties can have charge of the overall work, and other parties can have charge of the phase of the work in connection with which an injury occurs. In that event, all of them would have charge of the work within the meaning of the Act. *Crist v. Debron Corp.* (1981), 96 Ill. App. 3d 668, 672; *Westerfield v. Arjack Co.* (1979), 78 Ill. App. 3d 137, 141, 397 N.E.2d 451, citing *Emberton v. State Farm Mutual Insurance Co.* (1978), 71 Ill. 2d 111, 123.

■ The determination of whether a party is in charge of the work depends upon an evaluation of the totality of the circumstances. (*Ilic v. Henry Crown & Co.* (1981), 97 Ill. App. 3d 231, 234, 422 N.E.2d 892.) In *Chance v. City of Collinsville* (1983), 112 Ill. App. 3d 6, 445 N.E.2d 39, *appeal denied* (1983), 93 Ill. 2d 541, the appellate court enumerated the various factors probative of "having charge of." These include, but are not limited to: (1) supervision and control of

---

[2]In a specially concurring opinion to *Emberton,* Justice Dooley stated: "In my opinion, it would facilitate the work of the *nisi prius* and appellate courts of this State if we overruled *McGovern v. Standish* [citation] *a nomine.* It is contrary to the language of the Structural Work Act [citation], as well as a large body of decisions of this court on the issue as to what constitutes 'in charge of.' " *Emberton v. State Farm Mutual Automobile Insurance Co.* (1978), 71 Ill. 2d 111, 125 (Dooley, J., specially concurring).

the work; (2) retention of the right to supervise and control the work; (3) constant participation in ongoing activities at the construction site; (4) supervision and coordination of subcontractors; (5) responsibility for taking safety precautions at the jobsite; (6) authority to issue change orders; (7) the right to stop work; (8) ownership of the equipment at the jobsite; (9) defendant's familiarity with construction customs and practices; and (10) whether a party was in a position to assure worker safety or alleviate equipment deficiencies or improper work habits. *Chance v. City of Collinsville* (1983), 112 Ill. App. 3d 6, 11.

Regarding the case at bar, the evidence as to the foregoing factors established that defendant was in charge of the work. Without question, Edison's liability was not based merely on its status as owner of the La Salle construction site, which is insufficient in itself to create such liability. (*Ilic v. Henry Crown & Co.* (1981), 97 Ill. App. 3d 231, 235, citing *Norton v. Wilbur Waggoner Equipment Rental & Excavating Co.* (1979), 76 Ill. 2d 481.) Instead, defendant's liability was predicated on the following uncontroverted facts: Leo Burke, Edison's project superintendent at the La Salle construction site, stated that "the NRC [Nuclear Regulatory Commission] deals only with the owner, not with the contractors." Consequently, it is Edison that assumed the "quality control function" of insuring that its La Salle power plant met the intricate governmental regulations for construction of a nuclear facility. Edison's engineers had the authority, by virtue of paragraph 9 of Edison's contract with Walsh, to stop work that was not being performed in a safe manner. Arthur W. Kleinrath, Edison's manager of station construction, even admitted that under the above-mentioned contract, if the shoring tower removal was not being done in a safe and secure manner, then "*ultimately* its going to be Edison that's going to make a decision about whether that work in that manner is going to continue." (Emphasis added.)

Edison's retention of the right to supervise and control the work is readily discernible from Kleinrath's further concession that he was "in charge of" the construction going on at the various facilities that Edison was building—one of which included the "La Salle County Nuclear Station." Indeed, Leo Burke, Edison's construction superintendent at La Salle, indicated that a major change in the job schedule could only be accomplished with his company's approval. As a last resort, Edison had "the ultimate authority to chase a contractor off the project." And even as a prime contractor, Walsh was no exception to this unequivocal retention of control.

The issuance of a permit *to Edison* from the Federal government

was, of course, a prerequisite to construction of the La Salle nuclear power plant. It was Edison that would issue directives, plans and specifications to each contractor, and it was Edison that was ultimately responsible to make sure that those plans and specifications were "rigidly adhered to" by the contractors it retained to do the actual construction work. If there was "some deviation from the plans and specifications, *ultimately* it [was] up to Commonwealth Edison to see to it that the work of the contractor complie[d] with those specifications." The supervision and coordination of the contractors were clearly Edison's responsibility; indeed, if a coordination problem between two contractors ever arose, Burke acknowledged that "ultimately" it was Edison that would arbitrate the matter.

As far as Edison's constant participation in the ongoing activities, Burke admitted that "on a day-to-day basis" he knew where the Walsh employees were working at the La Salle construction site, as well as the type of work they were performing. In fact, Edison engineers under Burke "would spend a lot of their time out in the field watching the work being done by Walsh." These engineers were also responsible for "monitoring the work of Walsh" in order to insure that it was being performed safely in accordance with paragraph 9 of the contract entered into by the two entities.

Without question, Edison engineers had familiarity with construction customs and practices. It was these engineers, specifically Sam Wolinsky and Warren Volley, who explained to those involved on November 18, 1976, the different procedure to be employed for the removal of the shoring towers located at Turbine Unit No. 2. The reason, according to Wolinsky, was "that it would be very much quicker." And it is irrefutable that Edison was in a position, by contract as well as actual conduct, to secure worker safety and alleviate improper work habits. As Burke admitted at the conclusion of his re-cross-examination, he himself "would stop [Walsh] if it was dangerous in [his] mind."

Although plaintiff here was immediately responsible to Walsh as a laborer in its employ, we stress that "more than one person may be in charge of the work and be liable to an injured party under the Structural Work Act." (*Gall v. Metropolitan Sanitary District* (1982), 109 Ill. App. 3d 502, 507, 440 N.E.2d 973.) It was the court's conclusion below that it had "rarely seen a case where an owner such as Commonwealth Edison is here is so completely in charge of the overall work as the facts in this case presented themselves by the adverse testimony of the two men from Commonwealth Edison, Burke and Kleinrath so I think really that there is little question about the facts

in this case on that issue."

In support of its position to the contrary, defendant cites *Norton v. Wilbur Waggoner Equipment Rental & Excavating Co.* (1979), 76 Ill. 2d 481, for the principle that the question of "having charge of" is a question of fact to be decided by the jury. What defendant has failed to observe, however, is the exception to this general principle—"a trial court can grant a directed verdict on the issue when there is insufficient evidence to create a factual question." *Derrico v. Clark Equipment Co.* (1980), 91 Ill. App. 3d 4, 9, 413 N.E.2d 1345; see also *Crist v. Debron Corp.* (1981), 96 Ill. App. 3d 668, 672.

Here, defendant never presented a case in chief. From a review of the record before us, the insufficiency of evidence in defendant's favor is clearly apparent. No factual question with respect to Edison's authority over the La Salle construction project ever arose. Even viewing all of the evidence most favorably to defendant, we find that such evidence so overwhelmingly favors plaintiff that no contrary verdict could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) Accordingly, the order of the circuit court on the "having charge of" issue is upheld.

## II

■■■ Defendant next contends that the trial court improperly allowed into evidence the opinion testimony of plaintiff's expert, Charles Schultz, a construction safety consultant. We disagree.

Whether a witness is qualified to testify as an expert is within the sound discretion of the trial judge. (*Moore v. Farmers Insurance Exchange* (1982), 111 Ill. App. 3d 401, 413, 444 N.E.2d 220.) In order to lay a proper foundation for expert testimony, the expert must be shown to have special knowledge or experience in the area about which he expresses his opinion. (*Robinson v. Greeley & Hansen* (1983), 114 Ill. App. 3d 720, 728, 449 N.E.2d 250, *appeal denied* (1983), 96 Ill. 2d 551.) Furthermore, "[a] witness whose knowledge is based upon practical experience is no less an expert than one who possesses particular academic or scientific knowledge. *** There is insufficient basis for distinction between them, and it is for the jury to determine the weight to be given their testimony." *Presswood v. Morris* (1979), 70 Ill. App. 3d 513, 516, 388 N.E.2d 844, *appeal denied* (1979), 79 Ill. 2d 617; see also *Robinson v. Greeley & Hansen* (1983), 114 Ill. App. 3d 720, 728.

Here, Schultz' testimony established that he had considerable experience in the field of construction safety, particularly with respect to the procedure for proper removal of shoring towers. Having

worked in the construction industry since he was 17 years old, this 64-year-old safety consultant started out as a laborer in the Civilian Conservation Corps. He then worked for a plastering firm for three years during which he had occasion to work off of "wooden scaffolds with platforms." Thereafter, Schultz spent five years working as an operating engineer of heavy construction equipment, "includ[ing] cranes." His specific duties at that time involved "erecting steel, hoisting concrete, hoisting materials from one level to another level." Then, in 1966, Schultz commenced employment as a construction safety inspector for the State of Illinois. In this capacity, Schultz inspected construction sites "[l]ooking for violations of the health and safety act, unsafe work conditions." Schultz also trained new inspectors, held classroom instruction, "talk[ed] to associations, such as unions, contractors' associations, and [he] spoke before universities."

In 1975, Schultz went to work for the United States Department of Labor as a Federal compliance officer under the Occupational Safety and Health Act. Essentially, his duties there were the same as a construction safety inspector for the State of Illinois. He also instructed out of the OSHA Institute in Rosemont on the specific subject of construction safety. In 1977, Schultz began working as a private safety consultant in the construction industry. Various contractors, as well as the State of Illinois, have since retained him to inspect their jobsites for unsafe working conditions and to conduct safety seminars.

Schultz published, for distribution to contractors, approximately 60 articles on the subject of construction safety. Some of the articles dealt particularly with shoring towers and scaffolding. As a safety consultant, he inspected scaffolding as well as shoring towers. Schultz indicated a full awareness "of the customs and practices of the construction industry with respect to the safe erection and dismantling of scaffolding towers."

During the course of the trial, counsel for defendant was given, and took full advantage of, the opportunity to challenge Schultz' familiarity with shoring towers and his credibility as an expert in the field of construction safety. Moreover, the trial court carefully instructed the jury that they were to determine the weight and credibility "to be given any witness."

■ In Illinois, "the cases favor the permissive use of expert testimony in all types of cases where the jury would be aided in its understanding of the facts." (*Dodson v. Shaw* (1983), 113 Ill. App. 3d 1063, 1072, 448 N.E.2d 188.) Based upon his background and experience, it is clear that Schultz had sufficient qualifications to testify as an ex-

pert witness. His practical experience enabled him to form an opinion which would most definitely aid the jury. We are therefore of the opinion that the trial court did not abuse its discretion in allowing Charles Schultz to testify.

We are also unpersuaded by defendant's challenge as to the substance of Schultz' testimony. Essentially, defendant argues that this testimony was without foundation in that it was premised on conjecture, speculation and personal surmise.

■ It is uncontroverted that the hypothetical question is no longer the only means of eliciting an expert opinion where, as here, the expert lacks firsthand knowledge of the facts. (*Coffey v. Hancock* (1984), 122 Ill. App. 3d 442, 451, 461 N.E.2d 64.) In *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140, our supreme court adopted Federal Rule of Evidence 703, which expressly permits an expert witness to give his opinion on the basis of facts not in evidence, so long as those facts are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."[3] The *Wilson* court also adopted Federal Rule of Evidence 705, which places the burden on the adverse party during cross-examination to elicit the facts underlying the expert's opinion.[4] Applying these rules to the case at bar, we hold that no error occurred in eliciting Schultz' opinion.

■ The facts or data upon which expert opinions are based may, under Rule 703, be derived from presentation of data to the expert outside of court and other than by his own perception. (Fed. R. Evid. 703, Advisory Committee Note.) The information relied upon here was contained in two depositions (one of which was plaintiff's; the other was that of a Mr. Dennison), the accident reports, and other documents, "such as the Shoring Institute Standards, the Federal Register and the National Safety Council." From these materials, Schultz was able to give his opinion that the method employed for re-

---

[3]Rule 703 reads in full:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

[4]Rule 705 provides in full:

"The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination."

moving the shoring towers as a whole from Turbine Unit No. 2 was "a very unsafe practice." This was because "[y]ou take towers down the way you erect them," *i.e.*, "section by section."

We note with special significance that Schultz' testimony was uncontradicted and unrebutted. As explained in *Wilson*, the key element in applying Federal Rule 703 is whether the information upon which the expert bases his opinion is of a type that is reliable. (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 193.) Regarding the information relied upon by Schultz here, defendant has failed to show why such information would be any less reliable than the inadmissible, unsworn statements of patients, pharmacists, doctors, etc., which are clearly contemplated by Rule 703. (*Hatfield v. Sandoz-Wander, Inc.* (1984), 124 Ill. App. 3d 780, 788, 464 N.E.2d 1105.) Indeed, as an expert in construction safety, Schultz indicated that the various documents he reviewed prior to his testimony were that which he "typically would review prior to giving [an] opinion regarding construction practices."

In Illinois, "where the expert indicates that he found the *** information of assistance and that similar *** sources are commonly relied upon in his field, an opinion based upon such may properly be admitted." (*Manning v. Mock* (1983), 119 Ill. App. 3d 788, 802, 457 N.E.2d 447.) Specific evidence of unreliability would thus be a proper subject for impeachment of the expert's opinion. (119 Ill. App. 3d 788, 802.) There is nothing in the record before us, however, to suggest that the factual basis for Schultz' opinion was tainted with inaccuracies. As a result, the burden to demonstrate such unreliability was not met by defendant in the present case.

"The rule of law that testimony on ultimate issues is admissible only upon subjects beyond the understanding of the average juror, is outdated law." (*Watson v. State Farm Fire & Casualty Co.* (1984), 122 Ill. App. 3d 559, 564.) It is now well settled that expert testimony will be admissible even when directed toward an ultimate issue since the jury is free to reject the testimony. (*Dodson v. Shaw* (1983), 113 Ill. App. 3d 1063, 1072.) As we previously noted, the modern standard for admissibility of expert testimony is whether such testimony will aid the jurors' understanding of the facts. (*Watson v. State Farm Fire & Casualty Co.* (1984), 122 Ill. App. 3d 559, 564; *Dodson v. Shaw* (1983), 113 Ill. App. 3d 1063, 1072.) It is our opinion that the expert testimony in question falls within this modern standard and, therefore, was properly admitted into evidence.

### III

Next, it is defendant's contention that the trial court erred in

refusing to apply the doctrine of comparative negligence to the conduct of plaintiff in this Structural Work Act case.

*Simmons v. Union Electric* (1984), 104 Ill. 2d 444, is dispositive of this issue. In *Simmons*, our supreme court rejected the identical argument, holding that:

> "The Act, first passed as an exception to the common law, can only continue to remedy the evil envisioned by the legislature by excluding any consideration of the plaintiff's alleged fault." (104 Ill. 2d 444, 461.)

Therefore, since the sole inquiry under the Act is an assessment of the defendant's culpability and not the plaintiff's conduct, it was our supreme court's conclusion that "[c]omparative negligence must be disregarded so as to conform with the legislature's intent which was to afford complete protection for construction workers." *Simmons v. Union Electric Co.* (1984), 104 Ill. 2d 444, 461.

## IV

■■ The final issue for consideration is whether the trial court properly instructed the jury on the evidence as well as the law applicable to this action. Citations of error are made with regard to the following instructions:

Plaintiff's instructions Nos. 11, 14—A, 15—A, 17, 18, 20, 23 and 25, all of which were given to the jury; and defendant's instructions Nos. 3 and 4, neither of which were given to the jury.

Defendant asserts that plaintiff's instructions Nos. 14—A and 15—A were erroneously given because they did not allow the jury to deliberate on the element of "having charge of," as set forth in the Structural Work Act. Such omission, however, was correct in view of the propriety of the trial court's directed verdict on this issue.

To the contrary, defendant contends that plaintiff's instructions Nos. 11 and 25 were erroneously given because they apprised the jury of defendant's status and attendant responsibilities as an owner "having charge of" the construction project in question. Again, the jury was not required to decide whether defendant had charge of the La Salle power plant since the trial court correctly directed a verdict on this issue. We are not persuaded by defendant's argument that being in charge is the only statutory prerequisite to liability; plaintiff's instructions Nos. 14—A and 15—A together clearly set forth the issues as well as the three-prong burden of proof that plaintiff had to satisfy before liability could be imposed. In addition, the proximate causation language that defendant asserts should have been incorporated into No. 11 was, in fact, specifically included in No. 14—A. Regarding the ab-

sence of a requirement that there be a wilful violation of the Act, the comment to Illinois Pattern Jury Instruction (IPI), Civil, No. 180.01 (2d ed. 1971) reads, in pertinent part, that: "Because use of the word 'wilful' would tend to mislead the jury, the word has not been used." Comments, IPI Civil 2d No. 180.01, at 468.

■■ Defendant argues that plaintiff's instructions Nos. 17 and 18 were erroneously given because they failed to address the issue of comparative negligence. In view of our supreme court's recent holding in *Simmons*, however, this argument is without merit.

■■ Defendant contends that plaintiff's instructions Nos. 20 and 23 on the damages issue were unsupported by the evidence in the record. To the contrary, the following testimonial evidence provides an adequate basis for the trial court's decision to give these two instructions: Dr. Allan Hirschtick, an orthopedic surgeon, who examined plaintiff, indicated that his future surgical fees "would be in the neighborhood of $2,000."

With respect to future pain and suffering, Dr. Hirschtick stated that "there is marked degree of permanent disability *** there was indication for further surgery on the right foot with removal of the staples and inspection of the talonavicular and talocalcaneal joints, further appropriate measures as dictated by the findings at surgery." Although there has been successful fusion of one foot joint, there exists a "very definite failure of fusion of another joint and a questionable failure of fusion of the third joint, and the patient has persistent pain."

Moreover, plaintiff related to Dr. Hirschtick that "he continues to have much trouble with the right foot, with pain and swelling of the foot, and the symptoms are worse with weightbearing activities. *** [H]e still has intermittent pain and still has the cracking in the knee, and the knee still gives way occasionally. [H]e still has [back] pain, which is worse with prolonged standing, prolonged sitting, or prolonged walking." According to Dr. Hirschtick, plaintiff's injuries "have a very considerable effect in that his ability to walk is quite impaired ***." This is because the condition of his right foot and ankle is "not going to improve with time." In essence, "[plaintiff] will never be able to return to the work he was doing prior to sustaining these injuries."

Dr. Clifford Nyman, plaintiff's treating physician, testified that over three months after the accident, on January 25, 1977, "the findings were that [plaintiff] was continuing to have pain in his foot. X rays and his complaints were consistent with that of the development of a traumatic arthritis in the joint between the talus and the ascalcis," *i.e.* "[t]raumatic arthritis would imply that *** he developed an irregularity in that joint and pain in that joint."

In early 1978, Dr. Nyman indicated that plaintiff's condition "was one of pain, some mild swelling, and the inability to walk for any extended distance without having pain." In April of 1978, plaintiff was readmitted for a triple arthrodesis, whereby the "[surgeons] fuse joints, [they] must remove the cartilage covering so that [they] get bone in contact with bone." Here, three of plaintiff's joints were involved in the operation. However, plaintiff still experienced pain in April 1980 due to the fact that his injury had "continuing symptoms." At that time, Dr. Nyman advised him that he should "try to get into an occupation where he would not have to be working on his feet and lifting things all day. *** Something other than construction work."

Before trial, in August of 1982, plaintiff still experienced occasional pain and "intermittent numbness in the foot." Metallic staples that were placed in plaintiff's right foot were "going to stay there the rest of his life," and it was Dr. Nyman's opinion that plaintiff would never return to the full capacity of his work as a construction laborer. The physician then testified that the total itemized charges for his treatment of plaintiff were $1,583.

Plaintiff's testimony regarding pain and suffering is quite substantial. Elaboration of this evidence will be avoided in the interest of brevity. We do note, however, that plaintiff was unemployed for approximately 2½ years after his accident at the La Salle construction site. Prior to that time, Dr. Nyman never released him for purposes of returning to work as a construction laborer. In spring of 1979, plaintiff began working at Illinois Laundry & Dry Cleaners, but had to quit because he "couldn't take the walking anymore." Since his accident in November 1976, up until trial in February 1983, plaintiff worked no more than a total of 10 months. Regarding hobbies, plaintiff can no longer play softball, volleyball, bowl or hike.

Plaintiff's income tax forms and W-2 statements for the years 1974 through 1981 were admitted into evidence for the purpose of showing the amount of income plaintiff earned during those years. Copies of various medical bills, including hospitalization and radiological expenses, were also allowed into evidence without objection. Therefore, in view of the foregoing, defendant's argument that plaintiff's instructions Nos. 20 and 23 had no evidentiary basis is without merit. A thorough review of the record before us evinces that the jury was not prejudicially instructed on the elements of damages that were properly considered.

Defendant argues that its instruction No. 4 was erroneously rejected because the issue of sole proximate cause purportedly remained an element in determining liability under the Structural Work

Act. This particular instruction, however, should be given *"only* where there is evidence that the sole proximate cause of the injury or death may have been the conduct of persons other than the defendant, or a condition for which the defendant was not responsible." (Emphasis added.) (Notes on Use, IPI Civil 2d No. 180.18, at 495.) As the court below aptly commented, "where is the evidence of sole proximate cause in this case, [w]hat is the evidence of sole proximate cause of *some other party*. There has to be evidence of that before you can instruct," and "we don't have any evidence of a third party *** involved in this case."

Defendant's sole citation of authority for a contrary conclusion is *Zuelsdorf v. Montgomery Ward & Co.* (1978), 64 Ill. App. 3d 408, 380 N.E.2d 1130, *appeal denied* (1979), 72 Ill. 2d 585. Defendant's reliance on this case, however, is misplaced. As the *Zuelsdorf* court noted, "[i]n the present case, there existed a disputed issue of fact as to whether [defendant] was in charge of the operation and the jury's resolution of that issue [in favor of defendant] was not contrary to the manifest weight of the evidence." (64 Ill. App. 3d 408, 413.) As we previously discussed, no factual question with respect to Edison's authority over the La Salle construction project ever arose. Since Edison failed to introduce evidence of sole proximate cause on the part of any third party, we hold that the trial court properly rejected defendant's instruction No. 4.

■■■ Finally, defendant argues that its instruction No. 3 was erroneously rejected in light of *Norfolk & Western Ry. Co. v. Liepelt* (1980), 444 U.S. 490, 62 L. Ed. 2d 689, 100 S. Ct. 755. In *Liepelt*, the United States Supreme Court held that juries should be instructed in the nontaxability of damage awards in cases brought under the Federal Employer's Liability Act (45 U.S.C. sec. 51 *et seq.* (1976).) However, as defendant conceded during oral argument, the Illinois Supreme Court recently held that in cases involving purely State law, *Liepelt* is not directly controlling. (*Klawonn v. Mitchell* (1985), 105 Ill. 2d 450, 457.) Therefore, since the present action was based solely on Illinois statutory law, plaintiff's proof of pecuniary loss should not be rendered more complex by injecting the question of income tax. 105 Ill. 2d 450, 458.

For the reasons set out herein, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

PERLIN and HARTMAN, JJ., concur.