GEORGE MAKANEOLE, Plaintiff-Appellant, *v.* DRAKE GAMPON and KAUAI DEVELOPMENT CORP. dba OHBAYASHI-GUMI, LTD., Defendants-Appellees, and NORMAN'S CONSTRUCTION, INC.; N. MURAKAMI, INC.; NORBUB, INC.; SHERATON CORPORATION; and JOHN DOES 1-50, Defendants, and DILLINGHAM CONSTRUCTION CORPORATION, dba HAWAIIAN DREDGING & CONSTRUCTION COMPANY, LTD., Plaintiff-Intervenor-Appellant

NO. 12049

GEORGE MAKANEOLE, Plaintiff-Appellant, *v.* DRAKE GAMPON and KAUAI DEVELOPMENT CORP. dba OHBAYASHI-GUMI, LTD., Defendants-Appellees, and NORMAN'S CONSTRUCTION, INC.; N. MURAKAMI, INC.; NORBUB, INC.; SHERATON CORPORATION; and JOHN DOES 1-50, Defendants, and DILLINGHAM CONSTRUCTION CORPORATION, dba HAWAIIAN DREDGING & CONSTRUCTION COMPANY, LTD., Plaintiff-Intervenor-Appellant

NO. 12218

(CIVIL NO. 2915)

MARCH 9, 1989

BURNS, C.J., HEEN, J. AND
CIRCUIT JUDGE MARIE N. MILKS
IN PLACE OF ASSOCIATE JUDGE TANAKA, RECUSED

OPINION OF THE COURT BY HEEN, J.

In these consolidated cases, Plaintiff-Appellant George Makaneole (Makaneole) appeals from the judgment entered on the circuit court's directed verdicts in favor of Defendants-Appellees Drake Gampon (Gampon) and Kauai Development Corp., dba Ohbayashi-Gumi, Ltd. (KDC).[1] We vacate the judgment and remand for further proceedings.

I.

In our review of the granting of a directed verdict, we apply the same standard employed by the trial court. *See Lussier v. Mau-Van Development, Inc.,* 4 Haw. App. 359, 667 P.2d 804 (1983).

---

[1] Plaintiff-Intervenor-Appellant Dillingham Construction Corporation, dba Hawaiian Dredging & Construction Company, Ltd. (Dillingham), intervened in the lower court to assert its right to recoup workers' compensation benefits it paid to Plaintiff-Appellant George Makaneole (Makaneole), and to recover litigation expenses. Dillingham appeals from the directed verdicts for the same reasons, and has adopted the positions asserted by Makaneole.

Default judgments were entered on October 29, 1987, against Defendants Norman's Construction, Inc., N. Murakami, Inc., and Norbub, Inc. It is not clear from the record precisely what the relationship is among those companies, but they all appear to be owned by one Norman Murakami. In the opinion the companies will be referred to collectively as Norman's.

Makaneole has not appealed a summary judgment entered in favor of Defendant Sheraton Corporation.

[A] directed verdict may be granted only when after disregarding conflicting evidence, giving to the plaintiff's evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in plaintiff's favor, it can be said that there is no evidence to support a jury verdict in his favor.

*Wakabayashi v. Hertz*, 66 Haw. 265, 271, 660 P.2d 1309, 1313 (1983) (citations omitted). Put another way, if the evidence and all the fair inferences drawn from it, viewed in the light most favorable to the non-moving party, is of such character that reasonable persons in the exercise of fair and impartial judgment may reach different conclusions on a crucial issue, then the motion should be denied and the issue should be submitted to the jury. *Collins v. Greenstein*, 61 Haw. 26, 595 P.2d 275 (1979).[2] More than a scintilla of evidence is required to create a jury question. *See* 9 C. Wright and A. Miller, Federal Practice and Procedure: *Civil* § 2524 (1971).

## II.

On September 18, 1981, Makaneole was employed as a carpenter by Plaintiff-Intervenor-Appellant Dillingham Construction Corporation, dba Hawaiian Dredging & Construction Company, Ltd. (Dillingham). KDC was the owner of the Sheraton Kauai Hotel, and had hired Dillingham as the general contractor for the hotel's expansion. Makaneole was injured on the above date while he was working on the roof of the lobby/dining area of the hotel.

---

[2] Citing *Adair v. Hustace*, 64 Haw. 314, 640 P.2d 294 (1982), KDC argues that the standard is "substantial evidence," and KDC's brief essentially tries to argue that Makaneole's evidence is not substantial because it is not credible. In *Adair*, however, the substantial evidence standard was applied to a jury verdict. In *Petersen v. City and County of Honolulu*, 53 Haw. 440, 441, 496 P.2d 4, 6 (1972), the supreme court said, "The motion [for directed verdict] tests the sufficiency of the evidence to create a jury question. If there is any substantial evidence which might support a verdict for each side, the case should be submitted to the jury. *Boeing Co. v. Shipman*, 411 F.2d 365, 374-75 (5th Cir. 1969)." In *Boeing*, however, substantial evidence is defined as, "evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions[.]" *Id.* at 374. The substantial evidence test in *Boeing* is essentially the same as the test in *Collins v. Greenstein*, cited in the text. The question of credibility is generally not for the court to weigh on a motion for directed verdict. *See* 9 C. Wright and A. Miller, Federal Practice and Procedure: *Civil* § 2527 (1971).

The roof was constructed by nailing 4′×8′×1½″ plywood sheets adjacent to each other on top of the roof frame to form a base upon which roofing tiles were to be set. A crane was used to raise the plywood sheets, weighing about 200 pounds each, to the roof. The terminal rigging of the crane consisted of a heavy metal "c-clamp" attached to the end of the crane's cable by a loop of rope. When the carpenters were ready for a plywood sheet, a worker on the ground placed a single sheet in the jaws of the c-clamp and tightened the clamp onto the sheet. The plywood sheet was then raised by the crane to a height sufficient to clear the roof, and the boom was swung over to the area on the roof where the workmen were working. The plywood sheet was then lowered and set in place by the workmen. The plywood sheet was then removed from the c-clamp, the c-clamp bolt was tightened all the way down, and the boom was raised and swung back to the area of the plywood supply on the ground.

Both Westford Asao (Asao), Dillingham's acting job superintendent on September 18, 1981, and Frank Merritt (Merritt), Makaneole's expert, testified at trial that the unusually steep pitch of the roof made its construction process dangerous. Asao testified that in erecting a normal roof the plywood sheets could be delivered in bundles to the top of the frame, and stored there while individual sheets were being removed and placed. In this case, however, the pitch of the roof would not allow that procedure and the sheets had to be hoisted individually. The evidence also showed that because of the roof's pitch the workmen were required to nail lengths of wood horizontally onto the plywood sheets after they were placed on the frame in order to provide themselves a foothold, and that sawdust and chemicals within the plywood made the workmen's footing very precarious.

On the day of Makaneole's injury, the crane was operated by Gampon under the supervision of Glen Tanaka (Tanaka), a Dillingham employee. Norman's was hired by Dillingham originally as a subcontractor to undertake the crane work for the project. However, when Dillingham later discovered that Norman's was not a licensed contractor, Norman's status was changed, although it is not clear from the record exactly what the new status was. Asao testified that Norman's employees were put on Dillingham's payroll and Norman's was hired as a consultant for "his expertise in the

framing" work for the roof. According to Asao, Norman Murakami or Norbub had a contract to rent the crane to Dillingham and was paid a consultant fee at the end of the project. Gampon testified, on the other hand, that he was paid throughout the job by Norman's. The parties agree, however, that Gampon was an employee of Norman's.

Just prior to Makaneole's injury, Gampon had raised a sheet of plywood to a group of carpenters working on a part of the roof near where Makaneole was working. Because the crane was not located on the same side of the building where the carpenters and Makaneole were working, Gampon could not see them. He maneuvered the plywood sheet into position by responding to signals from one of the carpenters on the peak of the roof. After the sheet of plywood had been removed from the c-clamp by the carpenters, Gampon raised the c-clamp and began to swing the boom towards the area where Makaneole was working, not in the direction of the plywood supply, apparently on Tanaka's orders. Shortly after Gampon began to move the boom, something struck Makaneole's head and he was injured. Although no one saw what hit him, it appears that Makaneole was struck by the c-clamp, since it was found on the ground after the accident. Also, it was not determined whether the c-clamp became detached from the cable, striking Makaneole as it fell, or whether it struck Makaneole while it was still attached and then fell to the ground. Merritt's opinion was that it was still attached, but KDC and Gampon argue that it probably came loose from the loop of rope, because the jaws had not been bolted closed by the carpenters.

The motions for directed verdict were made at the close of Makaneole's case-in-chief.

We discuss the directed verdict in favor of KDC first.

### III.

We start with the proposition that KDC had a duty to provide Makaneole a safe workplace. *Michel v. Valdastri, Ltd.,* 59 Haw. 53, 575 P.2d 1299 (1978). In *Valdastri,* it was held that the lower court erred in not allowing the injured plaintiff worker to prove that the defendant, who had hired the plaintiff's employer to repair the defendant's gantry crane, had failed to conform to the provisions

of the State Safety Code dealing with cranes, derricks and hoists adopted pursuant to the Occupational Safety and Health Law (OSHL), Hawaii Revised Statutes (HRS) chapter 396 (1977). In *Taira v. Oahu Sugar Co., Ltd.,* 1 Haw. App. 208, 616 P.2d 1026 (1980), we held that one who hires an independent contractor to perform work is not liable for injuries to the independent contractor's employee resulting from that work where the independent contractor exercised complete direction and control over the performance of the work. The thrust of Makaneole's case is that KDC negligently exercised control over Dillingham.

In *Messier v. Association of Apartment Owners of Mt. Terrace,* 6 Haw. App. 525, 735 P.2d 939 (1987), we held that, on defendant Kaiser-Aetna's motion for summary judgment, the plaintiff's evidence that Kaiser had one or more of its employees on the jobsite daily overseeing the progress of the work was sufficient to raise a genuine issue of material fact on the extent of Kaiser's control over the contractor's performance of the contract, and the trial court erred in granting Kaiser's motion. Motions for summary judgment and directed verdict are analogous and where the evidence in either case is susceptible of conflicting interpretations neither the motion for summary judgment nor for directed verdict may be granted. *Kawaihae v. Hawaiian Ins. Cos.,* 1 Haw. App. 355, 619 P.2d 1086 (1980). In *Taira* and *Messier* we did not say what degree of control is necessary to impose liability on the employer.

The Restatement (Second) of Torts (Restatement), § 414 (1965) states the rule as follows:

§ 414. Negligence in Exercising Control Retained by Employer.

One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

Restatement, § 414 comment c attempts to outline the degree of control necessary to impose liability on the employer as follows:

c. In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that

he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

The nature and extent of control by an employer of an independent contractor of the independent contractor's performance of the work contracted for is a question of fact, *see Norton v. Wilbur Waggoner Equip. Rental & Excavating Co.,* 76 Ill. 2d 481, 31 Ill. Dec. 201, 394 N.E.2d 403 (1979), which is to be determined by a consideration of all the circumstances, *Johnson v. Commonwealth Edison Co.,* 133 Ill. App. 3d 472, 88 Ill. Dec. 449, 478 N.E.2d 1057 (1985), and both the contractual provisions and the evidence of actual control are relevant. *Moloso v. State,* 644 P.2d 205, 29 A.L.R.4th 1165 (Alaska 1982).

The dispositive question, here, is whether Makaneole's evidence is sufficient to create a jury issue on the question of KDC's control over the project. We hold that on the issue of contractual control the evidence was not sufficient, but that it was sufficient to raise a jury question on actual control.

### A.

Makaneole cites the following paragraphs in the contract to support his argument that KDC retained contractual control over the construction operations: 3.2.6; 3.3.1; 3.4.1; 5.2.1; 6.1.1; 6.3.1; 7.7.2; 8.3.1. We do not believe that the contract provisions give KDC control over Dillingham's method of work or operative details.

The contract provisions are clear and unambiguous and their interpretation is a matter of law. *Bishop Trust Co., Ltd. v. Central Union Church of Honolulu,* 3 Haw. App. 624, 656 P.2d 1353 (1983). Paragraph 3.3.1 only allows KDC to stop the work if Dillingham fails to correct defective work or fails to carry out the work according to the contract. Paragraph 3.4.1 gives KDC the right to carry

out the work in the event of Dillingham's failure to perform according to the contract. Paragraph 5.2.1 allows KDC to object to a subcontractor proposed by Dillingham to perform any part of the project, and under 5.2.2, Dillingham cannot contract with such subcontractor. Paragraph 6.1.1 allows KDC to perform work related to or not covered by the contract. Paragraph 6.3.1 only provides that in the event Dillingham and other contractors disagree as to who is responsible for clean up work, KDC may itself clean up and charge the contractors. Paragraph 7.7.2 provides only for testing procedure to ensure contract compliance. Paragraph 8.3.1 merely allows KDC to extend the contract time in case of excusable delay. The paragraphs cited by Makaneole do not, individually or together, afford KDC the right to determine how Dillingham is to perform its work.

We turn now to the question of actual control.

## B.

### 1.

·KDC's personal representative on the job was Noriyasu Fujiso (Fujiso), who was educated as an engineer and had extensive experience in construction. Makaneole argues that his evidence of Fujiso's job site activities was sufficient to allow a jury to find that KDC exercised actual control over the project and was negligent in its supervision. We agree.

Asao testified that Fujiso had his own private office on the project site; was present every day inspecting the progress of the work; informed Dillingham's foreman when a subcontractor was doing substandard work; called meetings between government officials and Dillingham relating to the project; coordinated the construction activities with governmental agencies, particularly the Kauai water department; hired contractors for the landscaping, the interior finish work and the room furnishings; coordinated the activities of the contractors KDC had hired with Dillingham's work; employed civil and structural engineers, and other consultants for the electrical and mechanical work; approved periodic payments to Dillingham and the subcontractors; directed the employment of certain subcontractors; acted as liaison between Dillingham and the

Sheraton employees regarding scheduling of construction phases; and approved extensions or delays in scheduling.

In his deposition Fujiso denied exercising any control over the project or any of its phases, and it may be that after a full trial KDC's evidence will completely rebut Makaneole's evidence. However, in light of the rules governing directed verdicts, the evidence is sufficient in our view to allow the jury to decide the issue of control.

2.

KDC also argues that the inquiry should be confined to the question of control over the crane operation or the safety of the project.[3] KDC points out that paragraphs 10.1.1, 10.2.2, 10.2.3, 10.2.6, and 10.2.7 of the contract specifically make Dillingham responsible for all matters concerning safety and safety precautions on the project.

The authorities are not in agreement over the question whether the employer's liability must be based upon specific control over the activity out of which the injury arose, or whether proof of general control of the work premises is sufficient.

Some jurisdictions base liability on the employer's control of the area or instrumentality that caused the injury. *See, e.g., Brock v. Alaska Int'l Ind. Inc.,* 645 P.2d 188 (Alaska 1982); *Cordova v. Parrett,* 146 Ariz. App. 79, 703 P.2d 1228 (1985); *Van Ness v. Independent Constr. Co.,* 392 So.2d 1017 (Fla. App. 1981); *Cummings v. Hoosier Marine Prop., Inc.,* 173 Ind. App. 372, 363 N.E.2d 1266 (1977); *Olds v. Pennsalt Chem. Corp.,* 432 F.2d 1033 (6th Cir. 1970), *cert. den.,* 401 U.S. 1010, 91 S.Ct. 1257, 28 L.Ed.2d 546 (1971) (Kentucky Law); *Sullivan v. Hormel & Co.,* 208 Neb. 262, 303 N.W.2d 476 (1981); *Fresquez v. Southwestern Ind. Contractors & Riggers, Inc.,* 89 N.M. 525, 554 P.2d 986, *cert. den.,* 90 N.M. 8, 558 P.2d 620 (1976); *Robinson v. Whitley Moving and Storage, Inc.,* 37 No. Car. App. 638, 246 S.E.2d 839 (1978); *Schlenk v. Northwestern Bell Tel. Co.,* 329 N.W.2d 605

---

[3] Makaneole's argument that Fujiso was talking to Tanaka shortly before the accident and may have been directing the crane operation is pure conjecture, and we reject it. However, as the opinion points out control of the crane operation, *per se,* is not determinative of KDC's liability, if any.

(N.D. 1983); *Bryant v. Gulf Oil Corp.*, 694 S.W.2d 443 (Tex. App. 1985); *Cowsert v. Crowley Maritime Corp.*, 101 Wash. 2d 402, 680 P.2d 46 (1984); *Snider v. Northern States Power Co.*, 81 Wis. 2d 224, 260 N.W.2d 260 (1977).

Other jurisdictions impose liability where the employer retains control of the general work premises. *See, e.g., Rabar v. E.I. Dupont,* 415 A.2d 499 (Del. Super. 1980); *Pasko v. Commonwealth Edison Co.,* 14 Ill. App. 3d 481, 302 N.E.2d 642 (1973); *Farris v. General Growth Development Corp.,* 354 N.W.2d 251 (Iowa App. 1984); *Corsetti v. Stone Co.,* 396 Mass. 1, 483 N.E.2d 793 (1985); *Funk v. General Motors Corp.,* 392 Mich. 91, 220 N.W.2d 641 (1974); *Warren v. McLouth Steel Corp.,* 111 Mich. App. 496, 314 N.W.2d 666 (1981); *Shannon v. Howard S. Wright Constr. Co.,* 181 Mont. 269, 593 P.2d 438 (1979); *Walker v. Mid-States Terminal, Inc.,* 17 Ohio App. 3d 19, 477 N.E.2d 1160 (1984); *Blumhardt v. Hartung,* 283 N.W.2d 229 (S.D. 1979).

We adopt the holding of *Jones v. Chevron U.S.A., Inc.,* 718 P.2d 890 (Wyo. 1986), that,

> an owner of a work site who retains the right to direct the manner of an independent contractor's performance or assumes affirmative duties with respect to safety owes a duty of reasonable care to an employee of the independent contractor even if the employee is injured doing the very work the contractor was hired to perform.

*Id.* at 896. The holding is, in our view, consonant with the principle of actual control. *See id.*

The employer who retains control over the independent contractor's manner of performance cannot avoid responsibility for injuries to the contractor's employee merely because the contract placed all safety responsibilities on the contractor, or because the employer had not affirmatively exercised any duties relating to safety.

In the instant case, it does not appear that KDC exercised any affirmative duties regarding safety. Nevertheless, in accordance with the rule announced above, if the jury should find that KDC exercised actual control over Dillingham's performance of the contract, the jury may hold KDC liable to Makaneole for negligently exercising that control by not ensuring that injuries arising from

Dillingham's performance were guarded against. Evidence in the case at hand of violation of the OSHL construction standards for cranes is relevant in determining whether KDC negligently exercised its control, if any, and failed to provide Makaneole with a safe place to work. *Cf. Taira, supra.* Those violations are discussed further in part IV, *infra.*

We emphasize that our holding is only that Makaneole's evidence, outlined above, is sufficient to raise for a jury the question as to KDC's control over Dillingham's performance of the contract, and that KDC can only be liable for Makaneole's injury if the jury finds that in fact KDC negligently exercised control over Dillingham's manner of doing the work.

C.

Citing Restatement, §§ 416 and 427, Makaneole also argues that KDC is vicariously liable for Dillingham's negligence because (1) KDC should have been aware that the roof design and its unorthodox method of construction created peculiar risk of harm to him, and (2) crane operation in construction is inherently dangerous.

Restatement, §§ 416 and 427, are closely related and "represent different forms of statement of the same general rule, that the employer remains liable for injuries resulting from dangers which he should contemplate at the time that he enters into the contract, and cannot shift to the contractor the responsibility for such dangers, or for taking precautions against them." Restatement, § 416 comment a. *Jones v. Chevron U.S.A., Inc., supra.*

The principles expressed by Restatement §§ 416 and 427 represent exceptions to the general rule that one who employs an independent contractor is not liable for the negligence of the independent contractor or the independent contractor's employees. *See Van Arsdale v. Hollinger,* 68 Cal. 2d 245, 66 Cal. Rptr. 20, 437 P.2d 508 (1968). However, most of the courts that have considered the question whether the exception applies to the independent contractor's employee who is injured on the job have refused to apply it in those circumstances. *Jones v. Chevron U.S.A., Inc., supra* (citing *Tauscher v. Puget Sound Power & Light Co.,* 96 Wash. 2d 274, 635 P.2d 426 (1981) ).

The employee * * * is covered by worker's compensation even if the contractor is insolvent. The owner should not have to pay for injuries caused by the contractor when the worker's compensation system already covers those injuries. *Sloan v. Atlantic Richfield Company,* Alaska, 552 P.2d 157, 160-161 (1976). The owner "has in a sense already assumed financial responsibility for the injuries" because the independent contractor passes along his worker's compensation costs to the owner. *Tauscher v. Puget Sound Power & Light Company, supra,* [635 P.2d] at 430; *Eutsler v. United States,* 376 F.2d 634, 636 (10th Cir. 1967).

Second, under worker's compensation, an employer is released from tort liability for his employee's job-related injuries. If we held an owner vicariously liable for injuries to the contractor's employees, then the owner would be subject to greater liability than if he employed his own workers to do the job. Owners might be encouraged to use their own inexperienced employees instead of experienced independent contractors who specialize in hazardous work. *Tauscher v. Puget Sound Power & Light Company, supra,* [635 P.2d] at 430-431.

Finally, if the owner maintains control over the work and exercises that control negligently, he can be directly liable to the employee for his own negligence. Rather than imposing vicarious liability in these cases, it is better to hold the contractor and the owner directly responsible for their own fault. The contractor will pay via worker's compensation and the owner through the tort system. *Conover v. Northern States Power Company, supra,* 313 N.W.2d [397] at 405 [(Minn. 1981)].

*Jones v. Chevron U.S.A., Inc.,* 718 P.2d at 899.

We agree with the reasoning in *Jones* for not applying the principles of §§ 416 and 427, *supra,* and hold that KDC is not liable for Makaneole's injuries under the peculiar risk of harm or inherently dangerous rule.

We turn now to the directed verdict in favor of Gampon.

## IV.

Merritt testified that a number of OSHL regulations relating to competency requirements for crane operators and to safety requirements and procedures for crane operations were applicable to

Gampon's crane activities.[4] Makaneole argues that the lower court should have allowed the jury to decide if the evidence of Gampon's failure to adhere to those regulations was sufficient to show that he was negligent and that his negligence caused Makaneole's injuries. We agree only with respect to the safety requirements and operating procedures.

In our view the evidence that Gampon may have been, under the OSHL regulations regarding the competency of crane operators, unqualified physically, or by training or experience, to be a crane operator is irrelevant. Gampon's negligence is to be judged by his performance, not his physical condition or training. *Kaczmarczyk v. City & County of Honolulu*, 65 Haw. 612, 656 P.2d 89 (1982). Additionally, there is no evidence that Gampon's physical condition, or training or experience contributed to causing Makaneole's injuries.

In regard to the operation of the crane, Merritt testified to OSHL violations as follows: lack of inspection of the rigging equipment; lack of a designated person in charge of safety to determine such things as position of the boom and the load, ground support, travel route, and the speed of movement; the clamp was not marked or tested for its load capacity; "tag lines" were not used on the loads; employees were not kept clear of the loads and the loads were carried over people; the signals used to direct the crane were not given by a designated signalman but by one of the carpenters; workers were not warned of the approach of a load.

Gampon contends that, if OSHL regulations were violated, he was only following Tanaka's orders in the crane operation and that Dillingham, not he, was responsible for safety precautions and observance of the OSHL regulations. We disagree.

HRS § 396-2 (1977) states that the purpose of OSHL is to encourage employers and employees to reduce on-the-job injuries.

---

[4] In his testimony Merritt refers to parts of Title 12, chapter 136, of the Administrative Rules of the Department of Labor and Industrial Relations (Rules). He also refers to various standards of the American National Standards Institute (ANSI). Although some of the Rules specifically adopt various ANSI standards, we have not been referred to anything that adopts all of the ANSI standards. However, neither KDC nor Gampon argue against the applicability of the ANSI standards, except in the causation context, and we will consider them as applicable.

HRS § 396-8(a) (1977) states that each employee is to comply with the standards, rules, regulations, and orders issued under OSHL. Other provisions of § 396-8 encourage an employee to participate in enforcement of the regulations, and prohibit retaliation by an employer against an employee who refuses to operate or handle unsafe machinery or equipment, or to engage in unsafe practices, or who files a complaint against an employer or asserts his or her rights under OSHL. The clear intent of the statute is that an employee is responsible not only for requiring that his employer observe the OSHL regulations, but in observing them himself. To hold that Gampon was not responsible for observing OSHL requirements would completely defeat the purpose of the statute.

Finally, Gampon argues that there is no showing in the evidence that the operation of the crane was a contributing cause of Makaneole's injuries; that Merritt's testimony that the c-clamp was still attached to the crane's cable when it struck Makaneole, was pure conjecture. He asserts that it is more probable that the c-clamp may have fallen because one of the workmen forgot to close the clamp after removing the plywood.

The argument merely points up the error in granting a directed verdict in favor of Gampon. It was the province of the jury to decide from the evidence how Makaneole's injury occurred, whether Gampon was negligent in failing to observe the OSHL standards and regulations, and whether Gampon's negligence, if any, was a contributing cause of the injury. *See Valdastri, supra.*

The judgment is vacated and the matter is remanded for further proceedings.

*Stanford Masui (Herbert R. Takahashi* with him on the briefs and *Danny J. Vasconcellos* with him on the reply brief; *Herbert R. Takahashi,* Attorney at Law, A Law Corporation, of counsel) for Makaneole.

*Miki Okumura (John R. Lacy* with her on the briefs; *Goodsill Anderson Quinn & Stifel,* of counsel) for Dillingham [appearance only].

*Philip S. Nerney (Kenneth S. Robbins* with him on the brief) for KDC.