Jerry W. KELLY, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 52A02–8701–CR–00012.

Court of Appeals of Indiana,
Second District.

Sept. 14, 1988.

Susan K. Carpenter, Public Defender, M.E. Tuke, Deputy Public Defender, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Gary Damon Secrest, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for appellee.

SHIELDS, Presiding Judge.

Jerry W. Kelly appeals his convictions and sentences for operating a vehicle while intoxicated, resulting in death,[1] and operating a vehicle while intoxicated resulting in serious bodily injury.[2]

We affirm in part and reverse in part.

### FACTS

This case was tried to the court. The decision was rendered solely on the basis of a Stipulation as to Testimony [Stipulation].[3] The Stipulation is summarized as follows:

Shortly before 7:00 p.m. on September 7, 1985, a collision occurred on U.S. Highway 31 in Miami County, Indiana. A farm tractor driven by Dale A. Wood was towing a second farm tractor driven by his daughter, Dedra L. Wood. A pick-up truck, driven by Doris I. Wood, Dale's wife, followed the tractors. A semi-tractor driven by Kelly and hauling two semi-trailers piggy-back collided with the rear of the pick-up, forcing it into the tractors. Dale Wood died as a result of the accident and Doris Wood was seriously injured.

State troopers arrived on the scene at 6:57 p.m. and removed two full 375 ml bottles and one partially-full 200 ml bottle of Jack Daniels whiskey from the semi-

---

1. IC 9–11–2–2 and IC 9–11–2–5 (Burns 1987).

2. IC 9–11–2–4 (Burns 1987).

3. Kelly also made a Stipulation of Fact—that he was the same person involved in the accident in question.

tractor cab. Troopers also recovered beer cans lying on the ground in the vicinity of the passenger-side door of the semi-tractor. Satisfactory fingerprints were not obtained from the cans. A trooper smelled alcohol on Kelly's breath.

Upon investigation, another trooper determined that, at the time of the collision, the tractors and pick-up were traveling on the pavement in the pullover lane, to the right of, and adjacent to, the driving lanes. The only lane indicator was temporary tape marking the center line.

According to Dedra and Doris Wood, the tractor driven by Dale Wood had two lighted headlights, two flashing rear caution lights, and one other lighted rear light. The tractor driven by Dedra Wood was without lights because the battery was dead. It did have a slow moving vehicle sign. The pick-up had two lighted headlights, lighted tail lights, and lighted flashers. A driver who was approaching the scene from the north, stated:

> I didn't see any lights on the tractors. I didn't see any lights at all except for the semi lights, and the reason I didn't pay any attention to the accident before it happened was because I didn't see anything, and until the semi-tractor lights came on the two tractors I couldn't see anything in the road either. I never did see Mrs. Wood's pickup truck.

Record at 139.

Troopers observed Kelly from the time of their arrival on the scene and at no time did they observe him consume any alcoholic beverage. At 8:45 p.m., Kelly was given an Intoxilyzer 5000 breath test for ethanol. The test revealed a BAC level of .29. A performance test was given to Kelly at 9:15 p.m. The trooper administering the test reported:

> Kelly['s] balance was swaying; he swayed when he walked and was unsure in walking. In turning, he swerved and in finger to nose tests, he completely missed his nose with both his right and left hand. His ability to understand instructions was ... poor to fair; the effects of alcohol obvious, and his ability to drive unfit.

Record at 139. Kelly admitted to having consumed three beers, but denied he was under the influence of alcohol at the time of the collision.

Two persons in a vehicle following the Kelly semi-tractor for approximately one mile prior to the collision stated the semi-tractor was weaving back and forth between the center line and the far right paved portion of the highway. As a result, they did "not attempt to pass the semi-tractor ... and ... drop[ped] back and slow[ed] down prior to the collision." Record at 140. Also, the driver of this following vehicle experienced "difficulty in preventing his own car from drifting to the right hand side of the roadway because he uses the white line delineating the right side of the roadway as a guide, and this white line was not painted on the roadway at the time of the collision." *Id.* Another driver saw Kelly's semi-tractor in the afternoon prior to the collision and stated that on three occasions Kelly stopped alongside the road and stood in a position suggesting he was urinating. This witness did not observe any problems with Kelly's driving.

Kelly stated he did not remember seeing any lights on the pick-up. It was further stipulated that a piggy-back semi-tractor with piggy-back trailers has a greater tendency to weave back and forth than does a semi-tractor pulling a single trailer.

In final argument, Kelly's counsel maintained this court's decision in *Micinski v. State* (1985), Ind.App., 479 N.E.2d 632 mandated acquittal. In its closing argument, the State advised the trial court the decision had been vacated by a grant of transfer in *Micinski v. State* (1986), Ind., 487 N.E.2d 150. Although the supreme court's decision was handed down on January 6, 1986, it did not appear in the advance sheets of the official reporter until the February 5, 1986 issue. It is undisputed that Kelly's attorney had not received that issue as of Kelly's trial, also on February 5, 1986.

At the hearing on Kelly's belated motion to correct error, Kelly testified he agreed to the use of the Stipulation at his trial because he "was led to believe [by his

attorney] that [the decision of the court of appeals in *Micinski*] would have quite a lot of bearing...." He further stated "[b]oth of us talked and both of us thought that this was the best way to go on this." Record at 389. Kelly also asserted he relied on his attorney's representation that if he were convicted his case would be overturned on appeal because of *Micinski*.

Kelly's counsel testified his decision to attempt to obtain the Stipulation occurred before he was aware of the Court of Appeals decision in *Micinski*. He explained he felt the Stipulation was a favorable strategy because, as finalized:

> I determined that the items that Mr. Palmer did not emphasize were important enough to present such a stipulation to the trial court in that the testimony from the person following Mr. Kelly's vehicle were stated in such a way that the harm to Mr. Kelly was minimized also, some of the testimony from witnesses who were traveling in the opposite lane in the opposite direction were ommitted [sic]. The stipulation did not go into redundancy which I believe would occur at trial before a jury. Based upon that stipulation I felt comfortable in presenting that to a trial court.
>
> BY THE COURT: You are saying there was some potentially unfavorable testimony from witnesses traveling in the opposite direction that you managed to avoid getting before the court?
>
> A. That's correct. But overall the reason was because of the lack of there being cumulative testimony whereas in a jury trial I am certain the prosecutor would continue to bring out the bad points over and over again before a jury.

Record at 395.

He also testified that the only evidence admitted as a result of the stipulation to which he would have objected at a trial before the court[4] was the result of the Intoxilyzer test. However, he also stated that his research revealed "there would be no way I could justify attacking the intoxi-

lyzer" as a scientific instrument. Record at 413. Further, Kelly's attorney testified he may have told Kelly that because his factual situation was similar, the *Micinski* decision was significant and might be determinative of the ultimate outcome of his case.

## ISSUES

1. Whether Kelly's consent to use of the Stipulation was involuntary because he gave it without advice as to the effect of the Stipulation upon his adversarial rights and because his consent was premised upon a misrepresentation made by his counsel.

2. Whether Kelly's counsel was ineffective in recommending and using the Stipulation because:

(a) It was without basis in statute or rule;

(b) It constituted poor strategy; and

(c) It was based upon counsel's mistaken assumption concerning the validity of an appellate decision.

3. Whether Kelly's counsel was ineffective because he relied upon a vacated appellate decision in presenting Kelly's defense.

4. Whether the trial court erred in imposing aggravated and consecutive sentences.

## I.

Kelly claims that his consent to use of the Stipulation was involuntary and he was thereby deprived of his right to an adversarial proceeding. His first contention is that his consent was involuntary because his attorney did not advise him the Stipulation effectively waived his adversarial rights.

■ Without addressing the obligation of the attorney to his client in this situation, we conclude there is no error because Kelly was not prejudiced by the omission. Prior to receiving the Stipulation, the trial court advised Kelly that but for the Stipulation he would have a right at trial to

---

4. Kelly waived his right to a jury trial on November 12, 1985, almost three (3) months prior to his trial.

confront and cross-examine witnesses, to subpoena and call his own witnesses and present evidence in his own behalf. The trial court also advised Kelly the Stipulation would "satisfy the requirement of law that each element of each crime be proved beyond a reasonable doubt ..." and of "the strong likelihood ... that after reading the stipulations and comparing them to the elements of the crimes, ... you will be found guilty...." Record at 331. Kelly responded that he understood each advisement and agreed to the use of the Stipulation. Thus, the trial court could reasonably conclude Kelly was adequately advised of the ramifications of the use of the Stipulation and consequently, his counsel's failure to advise him did not render his consent involuntary.

■ Kelly's second contention is that his consent to the use of the Stipulation is involuntary because it was based upon his counsel's misrepresentation concerning the effect of an appellate decision.

Kelly did testify he agreed to the use of the Stipulation because his attorney told him that if he were convicted the conviction would be overturned on the authority of the *Mincinski* decision. However, he also testified his counsel advised him the case would only have "quite a lot of bearing.... Both of us talked and both of us thought that this was the best way to go on this." Record at 389. Thus, even Kelly's testimony is equivocal concerning the alleged misrepresentation. Further, Kelly's counsel testified that his decision to attempt to obtain the Stipulation occurred before he was aware of the appellate court's decision in *Micinski*. He explained he felt the use of the Stipulation was favorable trial strategy. Moreover, according to Kelly's counsel, use of the Stipulation pertained to the method by which the evidence was to be presented while *Micinski* addressed the legal question of the elements of the offenses with which Kelly was charged. Thus, the trial court reasonably could have concluded Kelly's counsel did not advise him his conviction would be overturned on appeal and further, that even if he had, the *Micinski* discussions between Kelly and his counsel were unrelated to their discussions concerning the use of the Stipulation. The trial court did not err in concluding Kelly's consent to the Stipulation was not involuntary because premised upon a misrepresentation of his counsel.

## II.

■ Kelly asserts alternatively that even if his consent is valid, his counsel's performance was nevertheless deficient to the extent a new trial is required. The conduct about which he complains is counsel's use of the Stipulation.

Following *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, our supreme court has applied a two-step analysis in reviewing claims of ineffective assistance of counsel. Under the first step, "the defendant must demonstrate that the alleged acts or omissions by counsel fell outside the wide range of competent professional assistance." *Richardson v. State* (1985), Ind., 476 N.E.2d 497, 501. The second step is the prejudice component: "[T]he defendant will be entitled to relief only if the reviewing court determines that counsel's errors had an adverse effect upon the judgment." *Id.* In resolving factual disputes, we defer to the trial court as the sole judge of the weight and credibility of the evidence. "We will not reverse unless the evidence leads only to a conclusion contrary to the judgment." *Burr v. State* (1986), Ind., 492 N.E.2d 306, 308.

Kelly argues his attorney's performance in recommending, pursuing, and using the Stipulation was ineffective because it is without a basis in statute or rule, it was not strategically sound, and it was based upon counsel's error in assuming the validity of a vacated appellate decision. This ineffectiveness of counsel claim is without merit.

## A.

■ First, we are convinced there is nothing inherently improper with stipulating to expected testimony.

In Indiana, stipulating testimony is permitted in cases of absent witnesses under

Indiana Rule of Trial Procedure 53.5. Under this rule, a trial need not be postponed if the adverse party consents to stipulating the absent witness's testimony. Although T.R. 53.5 is not applicable in the instant case, it evidences the acceptability of stipulating testimony. Similarly, stipulations of fact are commonly used in Indiana and "have been looked upon with favor as a means of simplifying and expediting litigation." *Raper v. Union Fed. Sav. & Loan Ass'n. of Evansville* (1975), 166 Ind.App. 482, 488, 336 N.E.2d 840, 844.

■■■■ Also, contrary to Kelly's argument, a stipulation of evidence does not amount to a guilty plea. A stipulation that a particular witness would, if called, testify in a particular way neither constitutes an admission that such testimony is true, nor forecloses impeachment by the opposing party. It is entitled only to be accorded the same weight by the trier of the fact as it would be if orally given by the witness in open court. Therefore, use of the stipulation does not prevent the parties from arguing what the facts are and what inferences those facts reasonably support. A stipulation of testimony, in effect, merely waives the adverse party's right to confront and cross-examine the witness whose testimony is stipulated.

### B.

The trial court also could have reasonably concluded use of the Stipulation was a particularly effective trial strategy. Its use precluded introduction of testimony detrimental to Kelly and also minimized the impact of the testimony that was received by having it recited on paper as opposed to recounted by the declarants in open court. The testimony of at least two of these declarants, the wife and daughter of the decedent who were also involved in the accident, could reasonably be expected to be quite emotional and therefore impact adversely upon the fact finder regardless of whether the trial was by jury or to the court.

### C.

Kelly also asserts his counsel's performance was deficient in that his recommendation and use of the Stipulation was based on the vacated *Micinski* decision. Again, we must disagree. As previously set forth, Kelly's counsel testified he pursued the tactic of the Stipulation before he was fully cognizant of the court of appeals decision in *Micinski*. He also explained the Stipulation pertained to the method by which the evidence was to be submitted while *Micinski* addressed legal issues. Hence, the trial court reasonably could conclude the *Micinski* decision did not impact upon counsel's decision to recommend and use the Stipulation. Therefore, counsel's mistaken assumption concerning the validity of that decision did not render his performance ineffective as it pertains to the use of the Stipulation.

### III.

■■ Kelly also asserts his counsel was ineffective because he relied upon the *Micinski* opinion in presenting Kelly's defense. As a result, Kelly asserts he was harmed because the State was not compelled to prove his guilt and he was denied opportunities to object to evidence,[5] to raise an issue concerning the visibility of the tractors and pick-up truck,[6] and to question the scientific basis of the Intoxilyzer.[7]

The trial court did not err in concluding there was no nexus between the alleged incompetent act of counsel in relying on the vacated *Micinski* decision and the asserted harms. The harms which Kelly asserts as a result of the alleged incompetent act all arose in connection with the use of the

---

**5.** The fact is that Kelly's counsel testified he would not have had a basis to object to any of the evidence contained in the Stipulation had the witnesses so testified in open court.

**6.** The fact is the Stipulation raised the visibility issue by including the testimony of the southbound motorist.

**7.** The fact is Kelly's counsel conceded he did not have any basis for an objection to the scientific basis of the Intoxilyzer.

Stipulation. He does not suggest any harm independent of the use of the Stipulation, such as that a viable defense was open to him which was not pursued because of counsel's mistake. Accordingly, the trial court reasonably could have concluded Kelly was not prejudiced by counsel's mistake because the vacated *Micinski* decision did not impact upon counsel's decision to recommend, pursue, agree to, and use the Stipulation. Counsel so testified. In fact, counsel argued the facts and inferences favorable to Kelly with conviction and skill. The facts and law simply were against Kelly.

### IV.

### A.

 Kelly also claims the trial court erred in imposing aggravated, consecutive sentences. Because our disposition of the consecutive sentence issue moots several of Kelly's arguments, we address it first.

Kelly argues a consecutive sentence is inappropriate because only one act of criminal conduct occurred. This claim is similar to that made in *Zachary v. State* (1984), Ind., 469 N.E.2d 744, 749, where the defendant contended the trial court erred in imposing consecutive sentences because both crimes arose from the same incident. Our supreme court rejected this argument, holding consecutive sentences were appropriate because the two distinct and separately charged offenses each required proof of an element which the other did not. Thus, the question involved *different* offenses and the traditional *Blockburger* [8] analysis was used.

The federal double jeopardy clause provides three protections: "First, it protects against a second prosecution for the same offense after an acquittal. Second, it protects against a second prosecution for the same offense after a conviction. Third, it protects against multiple punishments for the same offense." *Whalen v. United States* (1980), 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 [Rehnquist, J., dissenting (citations omitted)].

Although the third category of protection is involved here, the answer is not found by applying the familiar *Blockburger* test for determining whether the same act may be twice punished as constituting two separately defined offenses. We are not concerned with separately defined offenses. Rather, the question is whether the same act may be twice punished as constituting two counts of the *same* offense. This issue is determined by ascertaining the intent of the lawmakers in enacting the particular criminal statute. *See Bell v. United States* (1955), 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905. "The whole point of whether multiple offenses of the same statute are committed during a single transaction focuses on the definition of the crime involved." *Hurst v. State* (1984), Ind.App., 464 N.E.2d 19, 21. Thus, the touchstone of whether the double jeopardy clause is violated is the legislature's articulated intent. *See Albernaz v. United States* (1981), 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275.

The various crimes (whether they are statutory crimes or common law crimes) are of course variously defined as to what actions and states of mind are required for guilt. Here we may note that the definitions also often require, in addition, the presence or absence of attendant *circumstances*, and sometimes require that the necessary conduct produce certain *results....*

In respect to the requirement of a result, some crimes are so worded that a bad result is needed for commission of the crime. For instance, criminal homicide requires a death of a human being, battery the injury of such a person, arson the burning of property, malicious mischief the injury or destruction of property, false pretenses the loss of title to property or money. On the other hand, many crimes are so defined that no bad result is required, it being the policy of the criminal law in these cases to punish activity likely to produce bad results if not nipped in the bud. Thus forgery may be committed although no one other than the forger ever saw the

---

**8.** *Blockburger v. United States* (1932), 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306.

forged document; perjury may be committed although the false testimony was not believed and so did not affect the outcome of the matter in dispute; criminal assault although the bullet intended for the victim missed him; attempt and conspiracy although the crime attempted or agreed upon was never consummated....

The totality of these various items—conduct, mental fault, plus attendant circumstances and specified result when required by the definition of a crime—may be said to constitute the "elements" of the crime.

*W. LaFave & A. Scott, Criminal Law* (1972) 7–8.

Following this logic, we must examine the particular statutes involved to determine the definition of the crime and thus determine whether Kelly violated it once or twice.

The relevant statutes read:

A person who operates a vehicle while intoxicated commits a class A misdemeanor.

IC 9–11–2–2 (Burns 1987).

A person who violates [IC 9–11–2–2] commits a class D felony if the crime results in serious bodily injury to another person.

IC 9–11–2–4 (Burns 1987).

A person who violates [IC 9–11–2–2] commits a class C felony if the crime results in the death of another person.

IC 9–11–2–5 (Burns 1987).

In crimes such as murder, manslaughter, battery and reckless homicide, the gravamen of the offense is causing the death or injury of another person, *i.e.*, the result is part of the definition of the crime. Thus, in these offenses where several deaths or injuries occur in the course of a single incident, the offense prohibited by statute has been violated several times over. The separate victims represent different offenses because conduct has been directed at each particular victim.

In contrast, in defining the subject offense, the legislature chose to use the result of serious bodily injury or death as a factor enhancing the punishment for the crime rather than as an aspect of the crime itself, *i.e.*, as part of the definition of the crime. IC 9–11–2–2 defines the crime as operating a vehicle while intoxicated. That definition consists of the prohibited conduct, operating a vehicle, and the presence of an attendant circumstance, intoxication. It does not include or require the necessary conduct produce a specific result. Thus, the crime is committed although no specific result occurs. This intent is irrebuttably evidenced by the language of IC 9–11–2–4 and 9–11–2–5 which identify *the crime* as a violation of IC 9–11–2–2: "A person who violates [IC 9–11–2–2] commits a class ... felony *if the crime results* in...." (emphasis added). Thus, we are compelled to conclude Kelly committed only one offense of operating a vehicle while intoxicated although with multiple results. The multiple egregious results do not increase the number of crimes, only the penalty. Had the legislature intended otherwise, mechanisms were available to express that intent. For example, the crime could have been defined as "whoever kills another human being while operating a vehicle while intoxicated commits a class C felony." There, the result of the conduct is part of the definition of the crime. An alternative approach would have been the enactment of a provision stating, in effect, that if more than one person dies and/or suffers serious bodily injuries as a result of violating IC 9–11–2–2, each death and/or serious bodily injury constitutes a separately punishable offense. *See e.g.* Alaska Statutes 11.41.135.

Inasmuch as the expressed intent of the General Assembly is that the crime is operating a vehicle while intoxicated, with the result (if any) affecting only the penalty, Kelly's separate convictions, arising from the single accident, cannot stand. Therefore we must vacate his conviction for the class D felony.

### B.

Kelly also claims the trial court erred in imposing an aggravated sentence for his class C felony conviction because the trial court's sentencing order fails to show that the trial court considered existing mitigat-

ing circumstances in determining his sentence and because the trial court considered improper aggravating factors.[9]

■ The decision to increase or decrease the statutory presumptive sentence within the boundaries of the statutory penalties rests within the discretion of the trial court, *Creasy v. State* (1988), Ind., 518 N.E.2d 785, 787, based upon its determination of the weight to be given to asserted mitigating or aggravating circumstances. *Shields v. State* (1988), Ind., 523 N.E.2d 411, 413. Accordingly, to facilitate meaningful appellate review, if the trial court imposes other than the presumptive sentence, it must include in its record 1) a statement of reasons identifying all significant mitigating and aggravating circumstances, 2) the specific facts and reasons which support the existence of the circumstances and 3) an articulation demonstrating that the various circumstances have been evaluated and balanced in determining the sentence. *Wilkins v. State* (1986), Ind., 500 N.E.2d 747.

■ Turning to Kelly's first argument, the trial court's sentencing order is not deficient even though it does not include an express statement that the trial court failed to find any mitigating circumstances. When a presumptive sentence is aggravated,

> use of mitigating circumstances in the determination of the ultimate sentence is not mandatory; it is discretionary with the sentencing court. When a defendant argues mitigating circumstances to the trial court, the sentencing judge is not obligated to explain why he has chosen not to make a finding of mitigation. This is particularly true when an examination of the underlying record shows the highly disputable nature of the mitigating factors. Moreover, the trial court is not obligated to credit or weigh the defendant's evidence of mitigating circumstances the same way the defendant does. However, the failure of a trial court to find mitigating circumstances which are clearly supported by the

record may reasonably give rise to a belief that they were overlooked and hence not properly considered.

*Hammons v. State* (1986), Ind., 493 N.E.2d 1250, 1254 (citations and footnote omitted).

Kelly's alleged mitigating factors are highly disputable in nature, weight, and significance. He points to his "extensive period of lawful conduct" and "the significant harm to Kelly's family by his incarceration." Appellant's brief at 43. However, the only hardship argued by Kelly is the ambiguous statement in the presentence report that Kelly's wife reported that "if and when Jerry is sent to prison, she and the children will suffer more than Jerry." Record at 150. Critically, the record is devoid of any evidence of Kelly's pattern of prior support of his family or a showing his imprisonment would result in undue hardship. Thus, as in *Wilkins v. State* (1986), Ind., 500 N.E.2d 747, 749, the trial court did not err in failing to address the issue of undue hardship as a mitigating circumstance.

Similarly, the trial court did not err in failing to address Kelly's period of "lawful conduct." The subject incident occurred on September 7, 1985. Although Kelly's period of lawful conduct spanned some seven years, the fact is he committed his fourth serious offense and his second consecutive offense for driving while intoxicated. We do not find error in the trial court's failure to specifically address that span of seven years as a mitigating circumstance.

■ Turning to Kelly's second claim, Kelly concedes two of the four aggravating circumstances enumerated by the trial court are "clearly justified"—1) his 1964 felony burglary conviction and his 1971 felony forgery conviction and 2) his 1978 conviction for driving while intoxicated. Hence, the trial court did not err in aggravating Kelly's sentence because an aggravated sentence may rest upon only one valid aggravating factor. *Shields*, 523 N.E.2d at 413.

The judgment on the class C felony is affirmed; the judgment on the class D

---

9. Kelly argues that two of the four factors considered by the trial court in aggravating his sentence are part of the offense of which he was convicted, and further, that these same two factors are duplicitous.

felony is reversed and Kelly's conviction and sentence for that felony ordered vacated.

SULLIVAN, J., concurs, with separate concurring opinion.

HOFFMAN, J., concurs.

SULLIVAN, Judge, concurring.

I fully concur with the majority as to Parts I, II, III and IV(B). As to Part IV(A), I agree that the Class D felony conviction must be set aside because:

"Kelly committed only one offense of operating a vehicle while intoxicated although with multiple results." Opinion at 1155.

I do not, however, agree that multiple convictions may always be properly obtained for offenses, the definition of which includes the result.

The majority correctly states that multiple offenses occur *if* "conduct has been directed at each particular victim." At 1155. But as opined in my separate concurrence in *Dupin v. State* (1988) 4th Dist. Ind.App., 524 N.E.2d 329, if the culpable conduct has not been so directed, the fact of multiple victims does not permit multiple convictions.