James L. SPAULDING, Appellant (Defendant Below),

v.

STATE of Indiana, Appellee (Plaintiff Below).

No. 47A01–8804–CR–111.

Court of Appeals of Indiana, First District.

Feb. 2, 1989.

Susan K. Carpenter, Public Defender, J. Michael Sauer, Deputy Public Defender, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Wendy Stone Messer, Deputy Atty. Gen., Indianapolis, for appellee.

ROBERTSON, Judge.

James L. Spaulding appeals his convictions of two counts of driving while intoxicated resulting in death, Class C felonies, and one count of driving while intoxicated resulting in serious bodily injury, a Class D felony.

We affirm in part and reverse in part.

## I.

Spaulding argues the evidence is insufficient to support his convictions in two respects: to show he was intoxicated and to show he was driving the vehicle at the time of the collision.[1] He maintains the evidence is insufficient to show he was intoxicated because the State failed to offer objective evidence of his impaired condition other than the tests of his blood, which he contends produced inconsistent results and lead only to the inference that his blood

---

1. Upon review for sufficient evidence, this court looks only to the evidence and reasonable inferences most favorable to the State. If the existence of each element of the crime charged may be found therefrom, beyond reasonable doubt, the verdict will not be disturbed. *Staggers v. State* (1985), Ind., 477 N.E.2d 539, 543.

alcohol content was below .08% at the time of the collision.

"Intoxicated" means under the influence of alcohol such that there is an impaired condition of thought and action and the loss of normal control of a person's faculties to such an extent as to endanger any person. IND.CODE 9–11–1–5 (1983 Supp.). "Relevant evidence of intoxication" includes evidence that at the time of an alleged violation there was at least five-hundredths percent (0.05%), but less than ten-hundredths percent (0.10%), by weight of alcohol in the person's blood. I.C. 9–11–1–7.5 (1985 Supp.).

■ Blood samples taken approximately three hours after the collision, which was Spaulding's last opportunity to consume alcohol, showed a whole blood alcohol content of .08% and a serum alcohol level of .142%. Hospital personnel drew the samples about fifteen minutes apart, the first sample being the one ultimately tested by the Indiana State Police laboratory and producing the .08% whole blood result.

The pathologist who supervised the testing at Dunn Memorial equated the serum alcohol result they obtained with a whole blood level of about .12%. He detailed the procedures used by the hospital laboratory and the factors which might cause the variance in the two samples, clarifying for the jury that the difference was probably caused by the manner in which the samples were obtained. The testimony of the hospital's pathologist supports a reasonable inference that the first sample was drawn near or through one of Spaulding's intravenous tubes and was probably diluted by the IV solution, although there was no direct evidence as to how the sample was obtained.

The pathologist also explained that a 150 lb. man with average alcohol tolerance and an empty stomach would reach a peak absorption of alcohol into his blood at about one hour after the alcohol was consumed. Then, depending upon the individual's metabolic process in the liver, absorption would decrease. An individual with a well-developed enzyme system would show a decrease in absorption at a rate of about 26%

or 25 milligrams per hour. Hence, the blood alcohol level of the ideal 150 lb. man would decrease about 50% after three hours. An inexperienced drinker would show such a decline more slowly.

To reiterate, Spaulding's contention is that the earlier sample demonstrates he was still absorbing alcohol three hours after the collision and leads only to the conclusion that his actual blood alcohol content at the time of the collision was lower than .08%. As we have pointed out in detail, the testimony of the hospital's pathologist directly refutes this assertion and constitutes relevant evidence of probative value upon which the jury could have determined that Spaulding was, in fact, under the influence of alcohol at the time of the collision.

Notwithstanding the blood tests, the jury might well have determined that Spaulding was intoxicated as that term is defined in I.C. 9–11–1–5 from the testimony of the numerous witnesses who observed Spaulding's driving before the collision or encountered him that evening. One witness described Spaulding as "too drunk to talk" and others saw him passing cars in heavy traffic on the right as well as the left, at high rates of speed, with his passenger standing upright in the convertible. Witnesses observed Spaulding go off the highway into the grass in an effort to pass on the right, lose control of the convertible and make a 90 degree cut across the highway into oncoming traffic. In our minds, this is objective evidence of an impaired condition of thought and action, and loss of normal control of one's faculties, to an endangering extent. When combined with the evidence of Spaulding's alcohol consumption, the evidence of intoxication is overwhelming.

■ Similarly, there is ample evidence to support the jury's determination that Spaulding was driving at the time of the collision. Witnesses observed Spaulding driving the convertible within fifteen minutes of the collision. Spaulding told police officers, medical personnel and others who stopped to help that he was driving, that he didn't intend to hurt anyone, and didn't

want to go to jail. While there is no direct evidence as Spaulding claims, that he actually said he was driving *at the time of the collision,* the testimony reasonably supports the inference that such was his intent.

Also, we note the point of impact on Spaulding's vehicle was on the passenger's side. Witnesses observed a passenger standing in the vehicle immediately before it crossed the highway. All three occupants were thrown from the convertible and were found with the car over an embankment. Witnesses observed the young man who died in the collision had been thrown against a fence; they found him between Spaulding and Spaulding's brother. While the evidence of the location of the car's occupants after impact certainly is not conclusive, it is circumstantial evidence tending to show that Spaulding was in the driver's seat at the time of the collision as he told persons at the scene and later in the hospital.

## II.

■ Spaulding contends the trial court abused its discretion when it ruled on his motion for change of venue from the county by failing to consider nineteen affidavits of persons in the community which were offered to show that Spaulding could not receive a fair trial. Spaulding cites *Anderson v. State* (1867), 28 Ind. 22 which stands for the proposition that, in ruling on a motion for change of venue, it is not erroneous for a trial judge to consider sworn statements of citizens to aid the court in exercising its discretion.

The record shows Spaulding offered, in addition to the affidavits, newspaper articles written after the accident. By these articles Spaulding presented an evidentiary basis for concluding that prejudice may exist in the community, since the reports misstated the evidence ultimately given at trial and contained matters which would be inadmissible. *See Kappos v. State* (1984), Ind., 465 N.E.2d 1092, 1095.

However, to prevail on appeal from the denial of a change of venue motion, the defense must show not only the existence of prejudicial publicity, but also that because of the adverse publicity, members of the community would be unable to set aside preconceived notions of guilt and render a verdict based upon the evidence. *Timmons v. State* (1986), Ind., 500 N.E.2d 1212, 1217; *Moore v. State* (1987), Ind., 515 N.E.2d 1099, 1102. In determining whether sentiment such as would preclude a fair trial exists in fact, we examine the record of voir dire. *Kappos, supra* at 1096.

The record reveals that one potential juror was excused for cause while nine were peremptorily challenged. We cannot discern to whom the challenges belonged. Therefore, we cannot ascertain from the record whether Spaulding exhausted all of the challenges made available to him in an effort to obtain a jury composed of persons not adversely affected by pretrial publicity. *See* I.C. 35–37–1–3. Moreover, each of the jurors ultimately selected assured the court and the defendant that he or she could put aside preconceived notions of guilt, regardless of what he or she may have read and would be able to base a verdict solely upon the evidence adduced at trial. These assurances belie Spaulding's claim that a fair and impartial jury could not be found because of widespread sentiment in the community. Hence, no abuse of discretion occurred.

## III.

Spaulding also argues he was denied a fair trial because the trial court coerced and intimidated potential jurors into stating, for the record, that they could be fair and impartial. He maintains the court assumed the role of a prosecutor and imposed its own opinions on the jury.

■ The function of voir dire is to ascertain whether or not the prospective juror can render a fair and impartial verdict in accordance with the law and the evidence. *Zachary v. State* (1984), Ind., 469 N.E.2d 744, 747. While a trial judge has broad discretionary power to regulate the form and substance of voir dire, the judge must remain impartial and refrain from making unnecessary remarks or comments. *Whitehead v. State* (1987), Ind., 511 N.E.2d

284, 291, *cert. denied*, —— U.S. ——, 108 S.Ct. 761, 98 L.Ed.2d 773.

■ We have reviewed the sections of voir dire cited by Spaulding and find no evidence of partiality, intimidation or coercion. In the first instance, the juror indicated that she worked with the father of one of the deceased, and in response to a series of questions by the prosecutor responded that she would not feel comfortable making the decision. At that point the court interjected that the question was one of whether the juror could be fair and impartial and not whether she would feel uncomfortable as a juror. The juror then stated unequivocally, when asked by the court, that she could not make a decision as to guilt or innocence based solely on the evidence adduced in the courtroom, and upon proper motion was excused for cause. We observe nothing inappropriate in this dialogue.

Similarly, the other two instances cited by Spaulding involved jurors who were ultimately excused and efforts by the trial judge to focus the questioning and responses. In the one instance the court explained the State's burden of proof and "reasonable" doubt after the juror began to think in terms of "a shadow of a doubt"; in the other, the juror indicated early on that she could be fair, and then later equivocated because she felt it would be difficult to render a decision without being sympathetic to the victims. In neither instance do we find any expression of opinion by the trial court or any indication whatsoever that the court had formed an opinion, and no unnecessary remarks or comments. Hence, we find no basis for concluding that Spaulding was denied a fair trial because the trial judge improperly influenced voir dire.

## IV.

■ Spaulding argues next that the trial court reversibly erred in permitting State Police Trooper Hawkins to testify as an expert in accident reconstruction. In short, Trooper Hawkins traced the path of Spaulding's vehicle for the jury from the physical evidence at the scene and by ex-amining the vehicles. He estimated, based upon various measurements, that Spaulding's convertible was traveling at about 75.8 miles per hour at the time of impact.

Spaulding does not dispute that the subject matter of Hawkins' testimony was scientific in nature and beyond the knowledge of the average lay person or that Hawkins' testimony was an aid to the jurors in assessing the circumstances of the collision. *See Fox v. State* (1987), Ind., 506 N.E.2d 1090, 1095. Rather, he makes only the assertion that a two-week course does not qualify one as an expert. We have repeatedly held however that no precise knowledge or quantum of knowledge is required, if the witness shows an acquaintance with the subject such as to qualify him to give an opinion, *see, Fox, id.; City of Indianapolis v. Robinson* (1981), Ind. App., 427 N.E.2d 902, 904–906, *trans. denied; Reid v. State* (1978), 267 Ind. 555, 372 N.E.2d 1149, 1152, because the requirement that a witness be qualified before being permitted to testify as an expert is predicated upon the witness's offer of an opinion that is based upon facts the average juror is incapable of interpreting for himself. *Id.* 372 N.E.2d at 1152. Generally, police officers fall within the classification of experts competent to render an opinion on the speed of an automobile in accident cases. *City of Indianapolis v. Robinson, supra* at 906.

Hawkins described in detail, without interruption by the defense, how he reconstructed the accident and estimated the speed of Spaulding's vehicle. He showed pictures of the skid marks, explained how certain of the marks were created by the convertible's steering column and gave measurements. Hawkins went through his calculations in determining the speed of Spaulding's vehicle on a blackboard step by step. The officer's reconstruction of the accident was consistent with the testimony of witnesses who were on the highway and observed firsthand the speed and path of Spaulding's vehicle. In our view, Hawkins showed competency in the field of accident reconstruction; the extent he was lacking in knowledge was for the jury to assess

and weigh, as Hawkins demonstrated at least minimal competency, derived from his 15½ years' experience as a police officer and training in accident reconstruction as to be an aid to the jury. *See Reid v. State,* supra 372 N.E.2d at 1152; *City of Indianapolis v. Robinson,* supra at 906. Hence, the trial court did not abuse its discretion by allowing Hawkins to testify.

The remainder of Spaulding's argument in this section challenges Hawkins' opinions and the facts upon which he relies. However, at trial, Spaulding objected only to Hawkins' qualification as an expert. He did not object when the witness assumed facts which were not in evidence, relied upon hearsay, or expressed an opinion on an issue ultimately for the jury as he argues in his brief. Spaulding's claim that Hawkins should not have been permitted to state that Spaulding was the driver cannot therefore constitute reversible error before this court as he did not raise his objections at trial. *See, Hughes v. State* (1985), Ind. App., 481 N.E.2d 135, 136.

### V.

■ Next, Spaulding argues the trial court erred by refusing his tendered instruction[2] which read:

Indiana has set a standard for intoxication by a determination of the weight of alcohol in a person's whole blood.

Spaulding maintains the jury needed to discern between the serum and whole blood test results in order to be able to determine whether he was driving while intoxicated resulting in death and bodily injury as the State charged. He acknowledges that a tendered instruction must be a correct statement of the law and must be supported by the evidence. In addition, the substance of a tendered instruction cannot be covered by other instructions. *See, e.g., Davis v. State* (1976), 265 Ind. 476, 355 N.E.2d 836, 838; *Smith v. State* (1987), Ind., 506 N.E.2d 31, 32–33.

I.C. 9–11–2–2 prohibits the operation of a motor vehicle while "intoxicated." "Intoxicated" has been defined by the legislature in I.C. 9–11–1–5 to mean "under the influence of ... alcohol ... such that there is an impaired condition of thought and action and loss of normal control of a person's faculties to such an extent as to endanger any person." Hence, to find Spaulding guilty of the underlying offense of driving while intoxicated, the jury need only find that Spaulding was in the condition described in I.C. 9–11–1–5 when he was operating the vehicle, as the trial court instructed; a determination of the precise level of alcohol in Spaulding's blood is unnecessary. To so instruct the jury would be misleading and an incorrect statement of the law. Spaulding's tendered instruction was therefore properly refused.

### VI.

■ Finally, Spaulding contends the cumulative effect of the trial court's comments during voir dire (considered in Issue III) and during Spaulding's testimony constituted fundamental error. Spaulding refers us to the following exchange, which he argues reflects the trial judge's disbelief in the testimony of Spaulding's brother that one of the decedents was driving the car.

Q. Had Shannon ever driven your automobile before?

Mrs. Hall: I'm going to object at that time, Your Honor, that's totally irrelevant to the proceedings at hand.

Mr. Herthel: I know Mr. Spaulding doesn't remember at the time of the accident, but I think, as for the inference, I think it's important that the jury know whether or not Shannon Rainey had driven his automobile.

Mrs. Hall: Your Honor, it doesn't matter who had driven his automobile before. It only matters who drove his automobile that night.

The Court: I understand that. The objection is overruled. You can answer that. There's evidence into the record, *for whatever it's worth,* that somebody else was driving the car. Please answer.

---

**2.** The trial court also refused Spaulding's tendered instruction number one which Spaulding now concedes is an incorrect statement of the law.

Our courts have held that a trial judge may, by conduct and demeanor, improperly impose himself or herself into a trial and thereby deny a defendant a fair trial. In such a case, where the judge's personal intervention in favor of the State is pervasive throughout the entire trial or is reasonably calculated to impeach or discredit a witness or his testimony, and the issue is close, such intervention or abandonment of impartiality constitutes fundamental error and necessitates the granting of a new trial. *See, e.g. Kennedy v. State* (1972), 258 Ind. 211, 280 N.E.2d 611; *Brannum v. State* (1977), 267 Ind. 51, 366 N.E.2d 1180; *Decker v. State* (1987), Ind.App., 515 N.E. 2d 1129, 1132. On the other hand, isolated exchanges or innocuous remarks, unaccompanied by a specific and contemporaneous objection, request for admonishment and motion for mistrial are subjected to the usual rules of appellate procedure and are deemed waived. *See, e.g. Lawson v. State* (1980), 274 Ind. 419, 412 N.E.2d 759, 769, *cert. denied* 452 U.S. 919, 101 S.Ct. 3057, 69 L.Ed.2d 424; *Horne v. State* (1983), Ind., 445 N.E.2d 976, 982; *Brackens v. State* (1985), Ind., 480 N.E.2d 536, 540; *Lahrman v. State* (1984), Ind.App., 465 N.E.2d 1162, 1168, *trans. denied.*

We have already held that the trial court did not conduct voir dire improperly or abandon its role of impartiality during jury selection proceedings. Thus, we are not confronted with a situation similar to that in *Kennedy* or *Brannum.* Neither does it appear the trial court's remark was intentionally designed to discredit; rather, it was part of the court's explanation of its ruling on the State's objection. *Cf. Horne, supra.* Moreover, as in other cases where it has been held a judge's remarks did not rise to the level of fundamental error, the jurors were instructed that they were the exclusive judges of the evidence, the credibility of the witnesses and the weight to be given the testimony. *See, Horne, supra.* Under these circumstances, we cannot conclude the trial court's comment, while perhaps unnecessary, was so egregious as to deny the defendant a fair trial; hence, any allegation of error with respect to the re-mark is deemed waived because no objection was timely made.

## VII.

Normally, this court will refrain from considering an issue which has not been raised in the motion to correct errors or on appeal to this court. However, when error appears clearly on the face of the record and is of the type which if not rectified would deny a defendant fundamental due process, this court will act sua sponte to remedy it. *Haggard v. State* (1983), Ind., 445 N.E.2d 969, 971; *see also, Carman v. State* (1985), Ind., 473 N.E.2d 618, 620. A sentence which exceeds the penalty authorized by the legislature constitutes an error of this magnitude. *Carman, id.; Kleinrichert v. State* (1973), 260 Ind. 537, 297 N.E.2d 822.

In *Kelly v. State* (1988), Ind.App., 527 N.E.2d 1148, *trans. pending,* the second district of this court examined the statutory provisions at issue here, i.e. I.C. 9–11–2–2, I.C. 9–11–2–4, and I.C. 9–11–2–5, and determined that the legislature of this state intended one punishment for a violation of I.C. 9–11–2–2 which results in multiple occurrences of serious bodily injury or death. We agree with this result for three reasons.

First, regardless of whether solely a matter of statutory construction or also of constitutional dimension, we believe legislative intent as expressed in the statutory provision at issue is the proper starting point in analyzing the problem of multiple punishments, for no act is punishable as a crime unless it is made so by the legislature. *See, Knotts v. State* (1963), 243 Ind. 501, 504, 187 N.E.2d 571. Hence, while the common law is useful in defining and construing criminal statutes, the general rules of common law applicable to other crimes do not dictate a particular result here.

Second, in our view, the decision in *Clem v. State* (1873), 42 Ind. 420 remains binding precedent. In that decision, the Indiana Supreme Court held the killing of two or more persons by the same act constitutes but one crime; consequently, the double jeopardy clause of the Indiana Constitution,

Art. I., § 14 precludes the prosecution and conviction for the death of a second victim following the conviction or acquittal of the first. *See, Clem,* 42 Ind. at 426–427, 429. The vitality of *Clem* is therefore not affected by *Elmore v. State* (1978), 269 Ind. 532, 382 N.E.2d 893 or decisions following it, as the result in that case stems from the double jeopardy clause of the Fifth Amendment to the U.S. Constitution, made applicable to the state by the Fourteenth Amendment. *See, Elmore, id.* 382 N.E.2d at 894.

Third, to the extent the decision in *Kelly, supra* is an application of federal constitutional law, we find it to be consistent with United States Supreme Court precedent. None of the Supreme Court's decisions are directly on point,[3] including *Blockburger v. United States* (1932), 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 and *Brown v. Ohio* (1977), 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed. 2d 187, which address the double jeopardy problem created by a violation of two distinct statutory provisions. *See Brown, id.* at 166, n. 6, 97 S.Ct. at 2226 n. 6 (*Blockburger* test not only standard for determining whether successive prosecutions impermissibly involve same offense; strict application of *Blockburger* test in *Ashe, supra* n. 3, would have permitted imposition of consecutive sentences had charges been consolidated in single proceeding). Under these circumstances, the Supreme Court's interpretation of federal legislation in cases like *Bell v. United States* (1955), 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 and *Ladner v. United States* (1958), 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199 provides guidance, since a claim under the double jeopardy clause cannot be separated entirely from a resolution of the question of statutory construction. *Whalen v. United States* (1980), 445 U.S. 684, 688, 100 S.Ct. 1432, 1435, 63 L.Ed.2d 715. *See also, Albernaz v. United States* (1981), 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275.

For these reasons, we adopt the reasoning of the second district in *Kelly, supra,* authority to the contrary notwithstanding. *Cf., Dupin v. State* (1988), Ind.App., 524 N.E.2d 329. We hold that Spaulding's multiple convictions of driving while intoxicated resulting in serious bodily injury and death cannot stand. We remand to the trial court with instructions to vacate his conviction of I.C. 9–11–2–4 and one of the convictions of I.C. 9–11–2–5, and to enter a sentence consistent with this opinion.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.

GARRARD, P.J., concurs in result.

RATLIFF, C.J., concurs with separate opinion in which GARRARD, P.J., concurs.

RATLIFF, Chief Judge, concurring.

To the extent that the majority opinion perpetuates the archaic rule that for expert testimony to be admissible it must concern a subject beyond the knowledge of the average lay person, I disagree. While this has been the rule, in *Summers v. State* (1986), Ind.App., 495 N.E.2d 799, we rejected that rule in favor of a more modern approach. In *Summers,* we said:

"The trend of recent cases seems to focus more attention on the knowledge and skill of the expert and whether the expert's opinion will be helpful to the trier of fact than on the question of the knowledge of the jury. *See* E.W. Cleary, *McCormick on Evidence,* at 33 (3d ed. 1984). This standard is incorporated in Fed.Rule of Evidence 702, which provides:

'If scientific, technical, or other specialized knowledge will assist the trier

**3.** Among the cases applying the double jeopardy clause, *Ashe v. Swenson* (1970), 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469, which involved the robbery of six poker players, most closely approximates the circumstances at issue here. In that decision, the Supreme Court held the acquittal of the robbery of one of the poker players precluded a subsequent prosecution for the robbery of a different victim. The court, focusing on the advantage gained by the State because of the earlier trial, reasoned that the Fifth Amendment guarantee against double jeopardy incorporated the federal rule of collateral estoppel. The opinion makes clear the issue before the court was one of relitigation following acquittal, not whether six punishments could be imposed for the robbing of six victims. 397 U.S. at 446, 90 S.Ct. at 1195.

of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.'

"In commenting upon Fed.R.Evid. 702, one authority has said:

'Must a court exclude expert testimony if the subject is within the comprehension of the average juror? Such a test is incompatible with the standard of helpfulness expressed in Rule 702. First, it assumes wrongly that there is a bright line separating issues within the comprehension of jurors from those that are not. Secondly, even when jurors are well equipped to make judgments on the basis of their common knowledge and experience, experts may have specialized knowledge to bring to bear on the same issue which would be helpful.'

3 J. Weinstein and M. Berger, *Weinstein's Evidence,* § 702(02) (1985).

"We believe the above quoted comment from *Weinstein,* although directed to Fed.R. of Evid. 702, is appropriate to our consideration of this issue. The modern trend is away from strict application of the rule excluding expert testimony on subjects within the common knowledge of jurors. *Carlson v. Hudson* (1974), 19 Ill.App.3d 576, 312 N.E.2d 19; *Stanley v. Board of Education* (1973), 9 Ill.App.3d 963, 293 N.E.2d 417.

'Traditionally, expert testimony has not been permitted when its subject matter is not beyond the knowledge and experience of the average juror [citation omitted], but more recently, the trend is to permit it if the expert has some special knowledge and his testimony is of aid to the jury even though the average juror would also have some knowledge of the subject matter. [Citations omitted.]'

"*Binge v. J.J. Borders Construction Co.* (1981), 95 Ill.App.3d 238, 50 Ill.Dec. 788, 791, 419 N.E.2d 1237, 1240. The modern standard for admissibility of expert testimony is whether that testimony will aid the jurors in understanding the facts.

*Johnson v. Commonwealth Edison Co.* (1985), 133 Ill.App.3d 472, 88 Ill.Dec. 449, 478 N.E.2d 1057. In order to be admitted into evidence, the expert testimony must assist the trier of fact in understanding the evidence or deciding a factual issue, and the witness must be qualified by knowledge, skill, experience, training, or education to give such testimony. *Ruffiner v. Material Service Corp.* (1985), 134 Ill.App.3d 747, 89 Ill. Dec. 414, 480 N.E.2d 1157."

495 N.E.2d at 802–03.

The majority correctly holds Trooper Hawkins' accident reconstruction testimony was admissible. I concur in that decision, but I do so on the basis of the rule announced in *Summers.*

In all other respects, I concur.

GARRARD, P.J., concurs.